531 A.2d 699

**David Cleveland ADKINS**

v.

**STATE of Maryland.**

**No. 60, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Oct. 7, 1987.

494

Laurie I. Mikva, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Ronald M. Levitan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, M. Kenneth Long, Jr., State's Atty. for Washington County, Andrew G.W. Norman and Thomas M. Digirolamo, Asst. State's Attys. for Washington County, on brief, Hagerstown), for appellee.

Argued before WILNER, KARWACKI and ROBERT M. BELL, JJ.

WILNER, Judge.

Appellant David Adkins was convicted in the Circuit Court for Washington County of felony murder and robbery, for which he was given consecutive sentences of life imprisonment and eight years imprisonment. Both convictions stemmed from the State's assertion and the jury's implicit finding that, in company with one Darryl Troxell, appellant robbed and murdered Joseph Teal on the evening of June 26, 1985.

Some of the most damaging evidence against appellant came from his brother-in-law, Lester Beach. Beach had been incarcerated in Pennsylvania on charges unrelated to this case. At some point, Corporal Douglas Mullendore of the Washington County Sheriff's Department worked out an arrangement with Beach and the Pennsylvania police authorities whereby, in consideration of Beach's cooperating with Mullendore on the Teal case, Pennsylvania dropped its charges against him and released him from prison. Implementing his part of the agreement, Beach (1) visited Troxell in the Washington County Detention Center on December 21, 1985, and allowed Corporal Mullendore to monitor and record his conversation with Troxell, and (2) had his girlfriend, Tina Carter, make a memorandum of a second conversation he had with appellant on December 29. It is principally the evidence of these events that appellant challenges in this appeal.[1]

### (1) Beach's Conversation With Troxell

By the time of trial, Troxell had already been tried, convicted, and sentenced for his role in the killing; his appeal to this Court was then pending. He was called as a

---

[1]. Appellant also complains that his conviction for robbery should be merged into the conviction for felony murder. The State concedes the error, which we shall correct in our mandate. *See Newton v. State,* 280 Md. 260, 373 A.2d 262 (1977).

witness by the State, out of the presence of the jury, but refused to answer any substantive questions on Fifth Amendment grounds. Relying on this Court's opinion in *Ellison v. State*, 65 Md.App. 321, 500 A.2d 650 (1985), the trial court concluded that Troxell was no longer in any danger of incrimination, and it ordered him to testify. He again refused, whereupon the court found him in contempt and sentenced him to six months in prison.

Troxell made very clear to counsel and to the court that, if recalled before the jury, he would continue to refuse to testify, notwithstanding the finding of contempt. The prosecutor urged that, in order to have a valid finding of "unavailability" sufficient to allow admission of the recorded conversation between Troxell and Beach, Troxell would have to be recalled, given another opportunity to testify, and decline. Defense counsel objected to that occurring before the jury, and initially the court agreed to conduct the further inquiry outside the presence of the jury. Counsel then made clear that he would object to a finding of "unavailability" whether or not Troxell was recalled before the jury, which led the court to change its view and permit Troxell to be recalled before the jury.

The next morning, before the jury, the State again called Troxell who, at the first question (after giving his name and address), invoked his Fifth Amendment privilege and announced that he would answer no further questions, whereupon the court found him in contempt and excused him.

Immediately, the court (1) declared Troxell to be unavailable as a witness, thus setting the stage for testimony from Beach and Mullendore about the December 21 conversation at the county detention center, and (2) found no prejudice from the recalling of Troxell before the jury and denied appellant's motion for mistrial based on that procedure.

Through Beach and Mullendore, the State then placed into evidence a court-edited tape and transcript of the conversation. Troxell's statements, parts of which clearly implicated both him and appellant in the robbery and killing,

were admitted as declarations against Troxell's penal interest.

Appellant makes three complaints about this evidence and the manner of its production. He contends that the court erred procedurally in allowing the State to recall Troxell before the jury, knowing that he would refuse to answer questions and would be found in contempt of court. Substantively, he attacks the admission of the tape and transcript as a violation of his Sixth Amendment right of confrontation and on the ground that Troxell's statements do not qualify as declarations against penal interest.

### (a) Procedure

In *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the Supreme Court made clear that the calling before a jury of a witness who the prosecutor knows will refuse to testify raises no Constitutional issue and does not necessarily constitute reversible error on evidentiary grounds. The Court did recognize, however, that there were circumstances under which such a procedure *could* constitute error. Drawing from lower court decisions, it identified two areas of concern: one, where the government "makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," in which event error can be based on prosecutorial misconduct, and, two, where "inferences from a witness' refusal to answer [add] critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly [prejudice] the defendant." *Id.,* 186–87, 83 S.Ct. at 1155.

Error on neither ground is to be presumed but must be judged from the attending circumstances. In *Vandegrift v. State,* 237 Md. 305, 206 A.2d 250 (1965), the Court of Appeals seemingly adopted, as "requirements for a court's finding of prejudicial error" (*id.,* 308, 206 A.2d 250), the five standards set forth in an A.L.R. annotation (*Prejudicial Effect of Prosecution's Calling As Witness, To Extract Claim of Self-Incrimination Privilege, One Involved in*

*Offense With Which Accused Is Charged,* 86 A.L.R.2d 1443, 1444 (1962)):

> " '1. that the witness appears to have been so closely implicated in the defendant's alleged criminal activities that the invocation by the witness of a claim of privilege when asked a relevant question tending to establish the offense charged will create an inference of the witness' complicity, which will, in turn, prejudice the defendant in the eyes of the jury;
>
> '2. that the prosecutor knew in advance or had reason to anticipate that the witness would claim his privilege, or had no reasonable basis for expecting him to waive it, and therefore, called him in bad faith and for an improper purpose;
>
> '3. that the witness had a right to invoke his privilege;
>
> '4. that defense counsel made timely objection and took exception to the prosecutor's misconduct; and
>
> '5. that the trial court refused or failed to cure the error by an appropriate instruction or admonition to the jury.' "

*Vandegrift, supra,* at 308–09, 206 A.2d 250. *See also Conway v. State,* 15 Md.App. 198, 217–18, 289 A.2d 862 (1972), where, following *Vandegrift,* we also employed those standards.

Other courts have articulated the standards somewhat differently—*see, for example, Zeigler v. Callahan,* 659 F.2d 254, 272 (1st Cir.1981)—but the difference seems more in language than in substance. In a supplementary annotation to that relied upon in *Vandegrift,* found in 19 A.L. R.4th 368 (1983), the commentator does not mention the five factors but instead concludes, in relevant part:

> "[I]t has been recognized expressly or by apparent implication in numerous cases throughout the annotation that it is improper for the prosecution to call as a witness one whom it knows will certainly invoke the privilege against testifying on the ground of self-incrimination, with the sole purpose or design of having the jury observe that

invocation. Obviously, it is difficult to demonstrate that the prosecution had this sole purpose or design, and it would be necessary, in any event, to demonstrate prejudice to the accused in order to effect the reversal of a conviction. Hence, the cases most commonly turn on the extent of the prejudice resulting to the accused, in all the circumstances, from the fact that the witness called did invoke the privilege, whether or not it is clear that the prosecution's sole or main purpose or design was to provoke such invocation."

*Id.*, 373.

▪ As the recent annotation indicates, this is becoming a more common problem plaguing both trial and appellate courts. Perhaps as a prophylactic rule—to avoid even an argument of prosecutorial misconduct or an inappropriate reliance on inferences drawn from invocation of the privilege—some courts have recommended and followed the procedure, at least in cases where the existence of the privilege is questionable, of ascertaining the witness's availability outside the presence of the jury. *See, for example, United States v. MacCloskey*, 682 F.2d 468, 478 n. 19 (4th Cir.1982):

"We think that the best procedure to follow after a witness has improperly invoked the Fifth Amendment or any privilege in such a situation, is to issue an order, outside of the jury's presence, directing him to testify and admonishing him that his continued refusal to testify would be punishable by contempt."

*See also United States v. Zappola*, 646 F.2d 48, 54 (2d Cir.1981); Annot., *supra*, 19 A.L.R.4th, at 418–20.

▪ We agree that that is the better approach, for it solves the problem in a practical way, especially when the State intends to use the exercise of the privilege as the basis for a finding of "unavailability." The critical requirement in such a case is a clear decision by the witness to maintain his silence after being informed that the court has rejected his claim of privilege and ordered him to testify.

There is no reason why that final decision must be made in the jury's presence, much less why the court's order to the witness to testify or its consequent finding of contempt need be announced before the jury.[2]

As most of the cases make clear, however, the failure of a court to follow that procedure does not, of itself, constitute reversible error. One must still look at the circumstances, focusing on the purpose and consequences of the event.

We are persuaded that there was no reversible error here. It is clear, in the first instance, that there was no prosecutorial misconduct. The prosecutor did not drag Troxell before the jury in order to create an impermissible inference of appellant's guilt from Troxell's refusal to testify. His concern was only that Troxell's refusal to testify be sufficiently well established, in light of defense counsel's objection, to warrant a finding of "unavailability" and thus permit the introduction of hearsay evidence.[3] Indeed, once Troxell invoked his privilege, the questioning ceased and he was excused. Nor did the prosecutor argue, or even suggest, to the jury that any inference of appellant's guilt should be drawn from Troxell's refusal to testify. As to that, he said no more than "it's too bad that [Troxell] would not oblige us all by repeating from the witness stand what

---

**2.** The trial judge, presented with this dilemma in the middle of the trial, asked counsel in vain for authority for their respective positions. Surely both counsel could have anticipated the problem sufficiently in advance to find and present at least some of the cases cited in the briefs before us.

**3.** As we noted earlier, at the time of the event, the court, based on this Court's opinion in *Ellison v. State*, 65 Md.App. 321, 500 A.2d 650 (1985), reasonably believed that Troxell was in no danger of incrimination and therefore was obliged to testify. On August 3, 1987, the Court of Appeals filed its opinion in *Ellison*, 310 Md. 244, 528 A.2d 1271 (1987), in which it made clear that a person in Troxell's position indeed *did* have a right to invoke his Fifth Amendment privilege. Whether Troxell's refusal to testify was legally justified is not especially relevant in this context, however. His "unavailability" as a witness would flow from the *fact* of his refusal to testify, not from whether that refusal was legally justified.

he told Lester Beach on December 21, 1985, but nonetheless, you've heard the tapes and you've got copies of the transcripts." The emphasis was on the affirmative evidence in the recorded conversation, not the invocation of the privilege. Whether we apply the particular factors enumerated in *Vandegrift* or the more general standard enunciated in the later A.L.R. annotation, there was simply insufficient prejudice to appellant to justify a reversal.

### (b) Substance

As we observed, appellant's substantive attack on the admission of the tape and transcript is in two parts. He complains first that Troxell's statement does not qualify under the hearsay rule as a declaration against penal interest, and second that the admission of the tape and transcript denied him his Sixth Amendment right of confrontation.

There is, of course, a significant overlap in these issues. As a starting point, we turn to *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), where the Supreme Court discussed in general terms the interplay between the Confrontation Clause and the hearsay rule. It summarized its conclusions at 66:

> "In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."

Both the Supreme Court and the Maryland Court of Appeals have recognized declarations against penal interest as valid exceptions to the hearsay rule and thus, in a criminal case, subject to the *Ohio v. Roberts* analysis. *See Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *New Mexico v. Earnest*, 477 U.S. 648, 106 S.Ct.

2734, 91 L.Ed.2d 539 (1986); *State v. Standifur*, 310 Md. 3, 526 A.2d 955 (1987). But both courts have recognized a sub-class of these declarations—those made by an accomplice or co-defendant that tend to inculpate the defendant—and have regarded them with a degree of wariness and suspicion beyond that expressed in regard to other hearsay exceptions. The focus of this concern is on the reliability of the statement. As Justice Brennan wrote for the Court in *Lee*, 476 U.S. at ——, 106 S.Ct. at 2064, 90 L.Ed.2d at 529, the Supreme Court has "consistently recognized [that] a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."

Recognizing these concerns, the *Standifur* Court described the test for admissibility of declarations against penal interest, against both a hearsay and Confrontation Clause objection, as follows:

"[A] trial judge considering the admissibility of a hearsay statement offered as a declaration against penal interest must carefully consider the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial judge should then consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted. A statement against interest that survives this analysis, and those related statements so closely connected with it as to be equally

trustworthy, are admissible as declarations against interest."

310 Md. at 17, 526 A.2d 955.

Appellant utilizes both prongs of this analysis in his attack on Troxell's declaration. First, he contends that Troxell was not sufficiently "unavailable," notwithstanding his firm resolve not to testify. His tripartite argument in this regard is that (1) the State "could have granted Troxell limited immunity to obtain his cooperation," (2) the State having already obtained a conviction and sentence, the likelihood of its using his testimony in the future against him was remote, and (3) the State "could have made a deal with Troxell in return for his testimony...." We find no merit whatever in these arguments.

As we observed in *Jacobs v. State,* 45 Md.App. 634, 653, 415 A.2d 590 (1980), "[t]he law is well settled that the invocation of the privilege against compelled self-incrimination is a sufficient showing of unavailability," especially where invocation of the privilege is justified as, under the Court of Appeals decision in *Ellison,* it was in this case. *See,* in general, Annot., *Witness' Refusal To Testify On Ground Of Self-Incrimination As Justifying Reception Of Evidence Of Prior Statements Or Admissions,* 43 A.L. R.3d 1413, 1415 (1972); also *Smith v. State,* 63 Md.App. 311, 322, 492 A.2d 926 (1985); Fed.R.Evid. 804(a)(1); *United States v. Brainard,* 690 F.2d 1117 (4th Cir.1982); *People v. Leach,* 15 Cal.3d 419, 124 Cal.Rptr. 752, 765, 541 P.2d 296, 309 (1975); *State v. Olsen,* 258 N.W.2d 898, 903 n. 2 (Minn.1977). As *Ellison* makes clear, however remote appellant thinks Troxell's chances of success on appeal may have been, he still was in jeopardy of incrimination, and, under the circumstances, we are hard-pressed to see how the State could have granted him immunity or "made a deal" for his testimony. In any event, the State has no obligation to offer any such extraordinary inducements in order to justify a finding of unavailability. *See State v. Fisher,* 141 Ariz. 227, 686 P.2d 750, 766 (1984).

 Appellant's attack on the reliability of Troxell's statement has somewhat more substance but, upon examination, is equally unpersuasive.

It is evident from *Standifur* that reliability involves two different levels of inquiry, which may, but need not, focus on the same parts of the statement. The first level concerns the nature and degree of inculpation to the declarant; is the statement really, and, from the declarant's point of view, perceptively, against his penal interest? The second level looks beyond that question and opens for examination any broader interest that the declarant may have to fabricate. While this inquiry may also encompass those statements directly inculpatory to the declarant, its principal focus is on those portions inculpatory to the defendant. That, of course, is the more suspect part. *Lee v. Illinois, supra,* 106 S.Ct. 2056.

We have examined Troxell's statement in the light of the circumstances surrounding its making and the information we have about Troxell, and we have no doubt that it is indeed a statement against his penal interest and was reasonably known by him at the time he made it to be so. Troxell was in jail on other charges but expected to be released within a week. He was aware that the Teal case was under active investigation, that, although the initial autopsy indicated that Teal died of a heart attack, the police suspected foul play; he, himself, had been questioned. Although no charges had yet been brought, he expressed concern that, if appellant and others did not remain silent, he *would* be charged. Yet, in response to Beach's question, "What did you all do, rob him," this colloquy occurred:

"DKT [Troxell]: They don't have nothing about that guy from down there at Kemps Mill. They can't prove nothing cause the autopsy came back that there was no foul play, that the guy died of a heart attack.

LOB [Beach]: Yeh.

DKT: So if Dave goes running his mouth, *their [sic] going to know that me and him was in on it. Their*

*[sic] going to get him because they know me and him was together that whole ... night.*

LOB: Damn. What did happen, what did you all do rob him or something?

DKT: *Yeh."*

(Emphasis added.)

That suffices as a statement against penal interest.

With respect to the second level of inquiry, we have the somewhat unusual situation of a statement made not to the police but to someone Troxell regarded as a friend. While, of itself, that does not entirely negate the kinds of suspect motives noted in *Lee,* it does at least put the statement in a different context. There is nothing to suggest that Troxell had at that time any motive to shift blame to appellant; nor did his statement purport to do so. There is nothing to suggest that Troxell was attempting to curry favor with Beach, exact revenge on appellant, or lessen his own role in the affair. Notwithstanding some suggestion by Beach and a concern by Troxell that appellant might try to pin the crime on him, Troxell said no more than that the two of them were together in the venture which both he and Beach knew to be the case, which appellant himself admitted to Beach, and which other evidence in the case confirmed. Under these circumstances, we find no error in admission of the tape and transcript.[4]

### (2) The Beach-Carter Statement

■ Lester Beach testified, without objection, about a brief conversation he had with appellant on December 28,

---

4. We do not regard Troxell's statement as admissible as an admission of a coconspirator. Quite apart from the fact that appellant was not charged with conspiracy, any common purpose that might have supported such a charge based on the killing and robbery of Teal had ended long before the statement was made. *See Lawrence v. The State,* 103 Md. 17, 63 A. 96 (1906); *see also* Annot., *Admissibility Of Statements Of Coconspirators Made After Termination Of Conspiracy And Outside Accused's Presence,* 4 A.L.R.3d 671 (1965); *Greenwald v. State,* 221 Md. 245, 157 A.2d 119 (1960); *Grandison v. State,* 305 Md. 685, 733, 506 A.2d 580 (1986); *Rivenbark v. State,* 66 Md.App. 378, 504 A.2d 647 (1986).

1985—the day Beach was released from jail. Appellant inquired about any questioning of Beach in connection with the Teal case and instructed him, "just don't tell them anything, that you don't know nothing." The next day, Beach said, appellant came to his home where they had another discussion about the Teal matter. Beach's girlfriend Tina Carter was in the home but was present to hear only part of the conversation.

Beach testified that appellant had come to his home to tell him "what to tell the police the next time they questioned me." He said that he could not remember exactly what appellant had told him to say, but that, after appellant left, he directed Tina to write down what appellant had said. He testified that he had Tina prepare the writing because he "couldn't spell most of the words." [5] He identified a one-page handwritten document as the writing made by Tina and said that it depicted what appellant had told him to tell the police. Tina Carter also identified the document as her writing and confirmed that she wrote it, at Beach's request, just after appellant left.[6] It was subsequently admitted into evidence.

Appellant complains that the document was inadmissible hearsay. We disagree. It was not admitted for the truth of the statements contained in it and did not rest, for its relevance or materiality, upon the credibility of the declarant. Quite the opposite; it was admitted to show a fabrication. It is a classic example of the "verbal act" described by Wigmore (6 Wigmore, Evidence, § 1766, at 250 (Chadbourn rev. 1976)):

"[I]n a prosecution against a defaulting embezzler Doe, it is desired to show that, after leaving his employment, he concealed himself and passed under a false name; here his statement, 'My name is Roe,' is not offered to evi-

---

**5.** Beach said that he went only to the eighth grade in school.

**6.** Both Beach and Carter also testified that, on that occasion, appellant admitted robbing and killing Teal.

dence that his name was in truth Roe; on the contrary, it will be shown that his name was Doe; and the statement is not used as hearsay."

At issue here was merely whether appellant made the statement recorded by Tina, not whether the statement was true. The determination of that rested upon the credibility of Beach and Carter, who testified.

JUDGMENT ON SECOND COUNT (FELONY MURDER) AFFIRMED; JUDGMENT ON THIRD COUNT (ROBBERY) VACATED; COSTS TO BE PAID THREE-FOURTHS BY APPELLANT, ONE-FOURTH BY WASHINGTON COUNTY.