622 A.2d 810

Ryan WILSON

v.

**STATE of Maryland.**

**No. 1253, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 7, 1993.

Victoria S. Lansburg, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

John J. Capowski, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before GARRITY, WENNER and DAVIS, JJ.

GARRITY, Judge.

At a jury trial in the Circuit Court for Prince George's County (McCullough, J., presiding), appellant Ryan Wilson was found guilty of conspiracy to commit robbery with a deadly weapon and accessory after the fact to the crime of

felony murder. He was sentenced to a term of 14 years for conspiracy and a concurrent term of five years for being an accessory.

## ISSUE

Appellant contends that the court erred in allowing into evidence the confession of a non-testifying co-defendant in a case in which the appellant was implicated in the crimes.

## BACKGROUND

The body of Lawrence Johnson was found at about 6:40 a.m. on January 6, 1990 in the parking lot of an apartment project located in Landover, Maryland. He had been shot once in the head. The body was lying next to his automobile with the door open and the engine running. Found inside the car were $310 in cash, two pagers, several pieces of paper with "initials or names and phone numbers" on them, and numerous small bags of cocaine. On Johnson's person was an additional $130 in cash. At trial, Detective Roger Irvin of the Prince George's County Police Department testified that he arrested co-defendant Perry Lee on January 11, 1990 and took the following statement from him:

On January 6th, 1990 me, Anthony, Ryan went out in my father's gold Honda. Ryan had his father's D.C. Police gun. We were going to rob a dope dealer. Anthony had the gun. We went around Dodge Park Apartments. There was no one out so we decided to leave. When I saw a car enter the apartment, myself and Ryan were walking on the sidewalk. Anthony was about 15 feet in the street. That's when the car came back and Anthony said, "Are you looking?" I could not hear what the person said in the car. Then Anthony said "Get on— get the fuck out or on." The car stood for 30 seconds, then pulled in and parked. A male got out the car. He then reached back in the car and hit the horn and turned to Anthony and said putting his hands in the air "I'm the

biggest dealer around here." Anthony then said, "No, fuck, you're not," and shot him. Anthony then ran. Me and Ryan walked away. I could not believe he had done that. I then got in my car, pick up Anthony, Ryan and talk about it and then dropped Ryan off and dropped Anthony off.

* * * * * *

[This is followed by:] Question number one, . . . "What is Anthony's name?" His answer, "Anthony Brady Weston." Question number two, "What is Ryan's name?" Answer, "Ryan O'Neil Wilson." Question number three, "Where does Anthony live?" Answer, "It's on Walkerton in Lanham, Maryland." Question number four, "Where does Ryan live?" Answer, "It's off of Hill Road somewhere. [sic] It's the first left after from the townhouses." Question number five, "What day did this occur?" His answer, "Friday night—Saturday morning." Question number six, "At approximately at what time did this occur?" His answer, "About 5:30 to 6:00 in the morning a.m." Question number seven, "What car were the three of you in?" His answer, "It's my father's '89 gold Honda, Maryland tag. I don't know the number." Question number eight, "Who had the gun?" His answer, "It was Ryan's father's gun, but Anthony had the gun." Question number nine, "Describe the gun." His answer, "It's a black gun with a brown handle, .38 Special with D.C. Cop written all over it." Question number ten, "How was Anthony carrying the gun?" His answer, "It was under his jacket." Question number eleven, "Where did the three of you go on Saturday, January the 6th, 1990?" Answer, "Dodge Park Road in Landover, Maryland." Question number twelve, "Why did the three of you go there?" His answer, "To rob someone with cocaine." Question number thirteen, "How did the shooting occur?" His answer, "Me and Ryan were walking down the sidewalk and we walked a couple of apartments down and came back. There were a couple people out there. They said that they did not have anything. We

were leaving. Me and Ryan were on the sidewalk. Anthony was ten to fifteen feet behind us and he was in the street. That's when a car came in. The car went down about three buildings and it looked like he was dropping somebody off. Meanwhile, we were calling Anthony and saying, 'Come on, Anthony, let's go.' The car came back and Anthony said, 'Are you looking for something?' He said that the—he said that to the guy in the car. I couldn't hear what the guy said. The car pulled in front of the building where he was shot at. The guy got out of the car. He was rolling down his window. When he was doing this he reached back in the car and blew the horn three times. He was facing the building. Anthony was behind him. The guy turned around and threw his hands in the air and said, 'I'm the biggest hustler around here.' And Anthony said, 'No, you're not. I am.' The whole time the gun was at his head. At first the guy hit the gun away and then Anthony shot the gun and then Anthony run down the street to the 25 Hour store. I walked to the car. Ryan left. He walked towards the store. I drove and picked up Ryan first and then Anthony. We talked driving home and I asked Anthony why he did that. He didn't say why he did it. I dropped Ryan off, then Anthony at their homes." My next question was, "What happened to the gun?" His answer was, "Anthony gave it to Ryan. I don't know what Ryan did with the gun." The next question was, "How many times did Anthony shoot the black male on Dodge Park Road?" His answer, "Once." Question number sixteen, "Did you tell anybody about this incident?" His answer, "My girlfriend. I don't want to tell you her name." Question number seventeen, "Do you remember what Anthony was wearing that night?" His answer, "He was wearing a blue Dallas coat and a pair of jeans." Question number eighteen, "What did you have on that night?" His answer, "A gray coat, blue jeans and some boots." Question number nineteen, "How about Ryan?" His answer, "I'm not sure," Question number twenty, "Did the guy

Anthony have any type of weapon?" Answer, "From the distance that I was at, no." Question number twenty-one, "How far back from Anthony were you when he shot the black male?" His answer, "Approximately ten to fifteen feet." Question number twenty-two, "Did Anthony take anything from the black male that he shot?" His answer was, "No." Question number twenty-three, "Did you waive your rights freely and knowingly?" His answer, "Yes. It was something that had to be done." Question number twenty-four, "Is the statement accurate as to what you told me?" His answer, "It can't get no better than it is." Question number twenty-five, "Is this the truth?" His answer, "To be honest the honest to God truth." Question number twenty-six, "Are you under the influence of any drug or narcotic?" His answer, "No, I'm not."

Special Agent Douglas Reardon of the Virginia State Police testified that he had arrested appellant on January 11, 1990. Appellant was interviewed in the dean's office of St. Paul's College in Lawrenceville, Virginia, where he was a student. Appellant made the following statement:

On Friday night or Saturday morning this happened 3:00 or 4:00 a.m. Anthony Weston, Perry Lee and me together we went by a friend's house, but I think he had moved. No one answered the door. His name was David Brewington. Within five seconds Anthony pulled a gun and shot the gun. The man that got shot said, "I'm the baddest guy around," and Anthony said, "No, I am." Anthony pulled the gun and the man smacked the gun away and then Anthony shot him. The car was parked a block away. Anthony gave me the gun when we got into the car. We dropped Anthony off at home. No, they dropped me off first. I took the gun in the house and put it back into my father's room in the closet in a cardboard box on the shelf. As far as I know the gun is still there. I had nuthin' [sic] to do with the shooting. It was not planned. I had not even spoke to the man. It was stupid what he did. Anthony said the man hit the gun and it

went off, but I saw Anthony bring the gun back to the man and shoot him.

Appellant gave a second statement at the Sheriff's Department, of which Agent Reardon made written notes, and appellant signed. That statement was almost exactly the same as appellant's first statement. Agent Reardon added that the appellant later related to him that "they had been out robbing drug dealers that night."

Detective Daniel Smart of the Prince George's County Police Department testified that he also interviewed the appellant on January 11 and took the following statement from him:

"On January 6th, 1990 around 3:00 to 4:00 a.m. when outside of some apartments in Landover, Maryland Perry Lee and I were walking down the side of the parking lot when two gentlemen began to argue. Anthony Weston pulled out a gun and shot a man. Then Perry and I proceeded to leave as Anthony Weston began running down the street with the gun. Then we got in the car and went home." The remainder of the statement is question and answer in my handwriting. Question, "Who were you with when the shooting occurred?" Answer, "Anthony Weston and Perry Wilson." [sic] Page two, question, "Who provided the gun?" Answer, "I did." Question, "Who does the gun belong to?" Answer, "My father." Question, "Did your father know that you had his gun?" Answer, "Nope." Question, "Why were you on Dodge Park Road?" Answer, "I was visiting a friend." Question, "How did you get to Dodge Park Road?" Answer, "Perry Lee drove us in his parents' car." Question, "What kind of car did he drive?" Answer, "A beige 1989 Honda Accord." Question, "Describe your father's gun, the one you used in the shooting." Answer, "A black .38 caliber with a wooden handle with a MPDC which is a Metropolitan Police Department Seal on it with a long barrel approximately six inches." Question, "How many shots did you hear?" Answer, "One." Question, "Who loaded the weapon?" Answer, "Anthony did." Question,

"Where did he get the bullets?" Answer, "I brought them with me." Question, "What part of the victim's body was struck by the bullets?" Answer, "I believe his head. I asked Anthony and he said he didn't know." Question, "What kind of car was the victim driving?" Answer, "I believe it was a blue Cressida." Question, "Where does your father keep the gun in his house?" Answer, "In the closet in the bedroom on the shelf to the right." Question, "Did you get a good look—did you get a look at the victim?" Answer, "He's a black male, husky with blue jeans." Page four, question, "What happened after the guy was shot?" Answer, "Perry Lee drove me home. Then he and Anthony went home." Question, "What did you do with the gun when you got home?" Answer, "I unloaded it and later on that day after the room was empty I put it back in my father's closet." Question, "Why did Anthony shoot the victim?" Answer, "They got into an argument. It was a macho thing. He reached out and hit the gun while Anthony had it on him." Question, "What happened to the expended rounds?" Answer, "It was just one. I threw it away in the trash in my bedroom." Question, "What was your intention on Dodge Park Road?" Answer, "We went up to buy drugs. We had been robbing drug dealers earlier." Question, "What were your intentions on Dodge Park Road?" Answer, "We went up there to rob dealers." Question, "Are you under the influence of drugs or alcohol?" Answer, "No." Question, "Have you been treated fairly?" Answer, "Yes."

The State's case concluded with the testimony of Officer Gary Taylor of the Prince George's County Police Department. Taylor testified that on January 11, 1990, he and other members of the police department entered the residence of appellant's parents at 508 Millwoof Drive in Capitol Heights and retrieved a gun from a box in a bedroom closet. The weapon was a Smith and Wesson service revolver, blue steel with a brown handle, stamped with the

seal of the Metropolitan Police Department, Washington, D.C.

## DISCUSSION OF LAW

Appellant asseverates that the trial court erred in allowing into evidence the confession of a non-testifying accomplice in a case in which appellant was implicated in the crimes. Pre-trial, appellant and his co-defendant, Perry Lee, both moved to suppress their respective confessions on the basis that they were coerced. The ruling as to each was that the confessions would be admitted. Subsequently, when the State began to introduce Lee's confession, both counsel objected. Appellant's counsel argued that Lee's statement "hurts my client also." The objection was overruled.

 The law is well established that ordinarily the confession of an accomplice may not be introduced at his and another's joint trial when the confession implicates the latter in the crime as well as the former, and the former is not available for cross-examination, despite an instruction to the jury to disregard the implicating confession against the co-defendant. Such hearsay confessions of an accomplice that incriminate defendants are presumptively unreliable. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Supreme Court has held, however, that the confession of a non-testifying co-defendant may be admitted where the circumstances of the confession provide indicia of reliability, and the co-defendants' confessions are significantly interlocking to rebut the presumption of unreliability. *Lee v. Illinois,* 476 U.S. 530, 544–546, 106 S.Ct. 2056, 2064–65, 90 L.Ed.2d 514 (1986).

The facts of *Bruton v. United States, supra,* are relatively straightforward. Bruton and his co-defendant Evans were tried jointly before a jury on the charge of armed postal robbery. At trial, although Evans elected not to take the stand, a postal inspector testified that Evans had confessed orally to the robbery and had implicated Bruton.

The trial judge instructed the jury that it should consider Evans' confession solely in determining Evans' guilt, but that it should be disregarded when considering Bruton's involvement because it constituted inadmissible hearsay against him. Evans and Bruton both appealed to the Court of Appeals for the Eighth Circuit. That court set aside Evans' conviction on the ground that the oral confession should not have been received against him but affirmed Bruton's conviction in view of the trial judge's instructions. On appeal to the Supreme Court, the Court held that because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining Bruton's guilt, the admission of Evans' confession in the joint trial violated Bruton's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. In doing so, the Court overruled its prior holding in *Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). The basic premise of *Delli Paoli* was that it is "reasonably possible for the jury to follow" sufficiently clear instructions to disregard the confessor's extrajudicial statement that his co-defendant participated with him in committing the crime. 352 U.S. at 239, 77 S.Ct. at 298.

In *Lee v. Illinois, supra,* Millie Lee and her boyfriend, Edwin Thomas, charged with committing a double murder, were tried jointly in a bench trial at which neither defendant testified. On the eve of trial, the attorneys for both defendants withdrew their motions for severance and for a jury trial.

In finding Lee guilty of both murders, the trial judge expressly relied on portions of her co-defendant's confession, particularly with respect to the court's rejection of Lee's assertions that she had not participated in the murder of one of the victims (Odessa, a friend of Lee's aunt) and that she had acted either in self-defense or under intense and sudden passion in killing the other victim, her aunt.

On appeal, the Supreme Court determined that, although the confessions overlapped to a great extent in their factual

recitations, they clearly diverged with respect to Lee's participation in the planning of her aunt's death, her assistance in the murder of the other victim, and factual circumstances relevant to the couple's premeditation. In remanding the matter to the trial court for its review as to harmlessness, in light of other evidence, the Court rejected the Illinois court's contention that the circumstances surrounding the confession rebutted the presumption that the co-defendant's statement could be trusted as regards Lee's participation in the murders.[1] The Court also rejected Illinois' second basis for establishing reliability, namely, that because Lee's and Thomas' confessions "interlocked" on some points, Thomas' confession should be deemed trustworthy in its entirety.

Justice Brennan, writing on behalf of the Court, observed:

> Obviously, when co-defendants' confessions are identical in all material respects, the likelihood that they are accurate is significantly increased. But a confession is not necessarily rendered reliable simply because some of the facts it contains "interlock" with the facts in the defendant's statement.... If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.

> In this case, the confessions overlap in their factual recitations to a great extent. However, they clearly

---

**1.** When co-defendant Thomas was taken in for questioning and read his rights, he refused to discuss the matter. The confession was elicited only after Thomas was told that Lee had already implicated him and only after he was implored by Lee to share "the rap" with her. *Lee v. Illinois,* 476 U.S. at 544, 106 S.Ct. at 2064.

diverge with respect to Lee's participation in the planning of her aunt's death, Lee's facilitation of the murder of Odessa, and certain factual circumstances relevant to the couple's premeditation.

*　　*　　*　　*　　*　　*

The subjects upon which these two confessions do not "interlock" cannot in any way be characterized as irrelevant or trivial. The discrepancies between the two go to the very issues in dispute at trial: the roles played by the two defendants in the killing of Odessa, and the question of premeditation in the killing of Aunt Beedie.

In sum, we are not convinced that there exist sufficient "indicia of reliability," flowing from either the circumstances surrounding the confession or the "interlocking" character of the confessions, to overcome the weighty presumption against the admission of such uncross-examined evidence. We therefore hold that on the record before us, there is no occasion to depart from the time-honored teaching that a co-defendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation.

*Lee v. Illinois*, 476 U.S. at 545–46, 106 S.Ct. at 2064–65.

We next examine the Court's treatment of the confrontation issue in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). The question facing it was whether the holding in *Bruton* applies where the defendant's own confession, corroborating that of his co-defendant, is introduced against him.

At the joint trial of the appellant Cruz and his brother for the felony murder of a gas station attendant, the trial court allowed the State, over objection, to introduce the brother's videotaped confession that he had killed the attendant who had just shot the appellant. The brother did not himself testify, and the court warned the jury that the brother's confession was not to be used against the appellant. The State also called a witness who testified about a conversa-

tion with the appellant that recited essentially the same facts as the brother's confession.

The New York Court of Appeals in *Cruz* affirmed appellant's conviction, adopting the reasoning of the plurality opinion in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), that *Bruton* did not require the brother's confession to be excluded because the appellant had himself confessed and his confession "interlocked" with that of his brother's. The four remaining justices participating in *Parker,* however, disagreed. They subscribed to the view expressed by Justice Blackmun that introduction of Parker's own interlocking confession might, in some cases, render the violation of the Confrontation Clause harmless but could not cause introduction of the nontestifying co-defendant's confession not to constitute a violation. The Supreme Court in *Cruz* adopted the approach by Justice Blackmun and remanded the matter. Writing on behalf of the Court in *Cruz,* Justice Scalia stated:

> We hold that, where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, see *Lee v. Illinois, supra,* the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him. Of course, the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient "indicia of reliability" to be directly admissible against him (assuming the "unavailability" of the codefendant) despite the lack of opportunity for cross-examination, see *Lee, supra* [476 U.S.], at 543–544 [106 S.Ct. at 2063–2064]; *Bruton, supra* [391 U.S.], at 128, n. 3 [88 S.Ct. at 1623, n. 3], and may be considered on appeal in assessing whether any Confrontation Clause violation was harmless, see *Harrington v. California,* 395 U.S. 250 [89 S.Ct. 1726, 23 L.Ed.2d 284] (1969).

We had occasion to visit the issue in *In re Montrail M.,* 87 Md.App. 420, 589 A.2d 1318, *aff'd on other grounds,* 325

Md. 527, 601 A.2d 1102 (1992). In *Montrail,* four juveniles were arrested and charged with possession of cocaine with intent to distribute. The arresting officer testified to the effect that each youngster told him that he and the others had driven to Philadelphia earlier that evening and had purchased drugs. Although we did not expressly relate the circumstances surrounding the confessions as to reliability, we determined that the violation of the *Bruton* rule was harmless error and remanded the matter on the basis of *Cruz.*

■ In the case *sub judice,* appellant's and his co-defendant's confessions are substantially identical in all significant aspects. Both confessions identify the persons involved as Perry Lee, Anthony Weston, and appellant, Ryan Wilson. Both confessions relate that the car in which they went to the scene was Perry Lee's father's Honda. Both confessions state that appellant supplied the gun, which was his father's .38 police revolver. Both confessions state that Anthony Weston got into an argument at Dodge Park Apartments with a man none of them knew, and that Weston shot him. Both confessions state that Weston then ran, and that the trio later drove home in the Honda.

Appellant concedes that there was significant overlapping between Perry Lee's statements and those of the appellant's, but contends that there were also significant divergences, in that, according to appellant, "Perry Lee's statements established beyond question that the one and only purpose in going to the Dodge Park Apartments was to find a cocaine dealer and rob him." Appellant's statements, on the other hand, "were much more equivocal" regarding the purpose or motivation for going to the Dodge Park Apartments. Therefore, appellant asseverates, Lee's statements implicated appellant in a conspiracy to rob Lawrence Johnson far more than appellant's own statements did, and thus, under *Lee v. Illinois,* it cannot be said that the non-interlocking parts of the confessions were "irrelevant or trivial." We disagree.

The co-defendant said, "We were going to rob a dope dealer." In response to a question asking why the three went to Dodge Park Road, the co-defendant answered, "To rob someone with cocaine." Appellant, in response to the question, "What were your intentions on Dodge Park Road?" answered, "We went up there to rob dealers." Because both co-defendants stated that they were going to Dodge Park to rob drug dealers, the fact that appellant may have had additional motivations does not render the confessions significantly different. While the statements may contain somewhat varying degrees of detail, they are materially parallel.

■ Importantly, the circumstances of the actual taking of the independent confessions further demonstrate their strength and reliability. First, unlike the defendant in *Lee v. Illinois*, 476 U.S. at 544, 106 S.Ct. at 2064, appellant's co-defendant did not initially refuse to talk with police. Rather, he voluntarily confessed immediately after being advised of his rights. Second, unlike the situation in *Lee*, appellant's co-defendant was not told that the appellant had already confessed. In fact, appellant's statement of confession was taken after that of his co-defendant's. Third, the primary reason for viewing non-testifying co-defendant confessions as unreliable, in many instances, is the apparent motivation of an accomplice to blame his co-defendant and to mitigate the appearance of his own culpability. In the case *sub judice*, unlike the situation in *Lee*, the co-defendant's confession placed primary fault with a third accomplice, the shooter, who was not a party in appellant's trial. Indeed, much of the co-defendant's confession exculpates appellant.

We hold that the *Bruton* rule does not apply in the context of the matter before us. The independent circumstances surrounding the taking of the confessions, in addition to their significantly interlocking detail of material aspects, clearly evidenced sufficient indicia of reliability to rebut the presumption of unreliability of the co-defendant's

confession and was properly admitted as direct evidence against the appellant.

█ In any event, even assuming that the non-testifying co-defendant's confession was not directly admissible against the appellant, we believe that under the facts and circumstances of this case, wherein the appellant's independent confession supported the co-defendant's, the Confrontation Clause violation was harmless. *See generally Cruz,* 481 U.S. at 194, 107 S.Ct. at 17, 9.

JUDGMENTS AFFIRMED;

COSTS TO BE PAID BY APPELLANT.