660 A.2d 935

**Michael Stewart MATUSKY**

v.

**STATE OF MARYLAND**

**No. 1278, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 28, 1995.

Edward C. Covahey, Jr. (Covahey & Boozer, P.A. on the brief), Towson, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Argued before: CATHELL, MURPHY and SALMON, JJ.

MURPHY, Judge.

In the Circuit Court for Baltimore County, a jury (Hon. Thomas J. Bollinger, presiding) convicted Michael Stewart Matusky, appellant, of two first degree murders. Appellant concedes that the evidence was sufficient to establish that, on January 24, 1993, he killed Pamela Poffel and her mother, Gertrude, by stabbing each victim with a sharp, single edged object. He seeks a new trial, however, on the ground that the trial judge erroneously overruled his objection to the introduction of an out-of-court declaration that identified him as the killer and established his motive for the murders.

The trial judge found that a reasonable person in the declarant's position would appreciate the fact that the words spoken were, for the most part, self-inculpatory. That factual finding was not clearly erroneous. We are, however, unable to affirm the ruling that the entire declaration was admissible. The jury should have heard only those portions of the declaration that were self-inculpatory as to the declarant.

## FACTS

The statement at issue was made by Richard Dean White, Pamela Poffel's ex-husband. The witness to that statement was Rebecca Marchewka, White's girlfriend when the statement was made. White and Marchewka were questioned by the police on January 27th. White told the investigating officers that he knew nothing about the murders. He also told them that, on January 24th, he and Marchewka had been together all day. White's statement was false. It was, however, corroborated by Marchewka at that time.

On April 13, 1993, Marchewka contacted the investigators and told them that she had lied about being with White when the murders occurred. She said that she agreed to tell that lie because White originally told her that he had been drinking in two bars—The Pit and Wargo's—on the day of the mur-

ders, and his "probation would be violated" if the authorities found out what he was really doing on that day.

Marchewka then said that, two days before she decided to come forward, White told her that the Poffels had been murdered by appellant, who blamed them for the suicide of Ted Poffell—Pam's brother, Gertrude's son and appellant's close friend. In a type-written statement that she signed on April 27, 1993, Marchewka provided the following details:

On April 11, 1993 (Easter Sunday) after I arrived home, I went to the Pit to see if Richard was there. I brought him home. He had been drinking a lot and appeared depressed. He said he wanted to talk to me but couldn't. When we got home, he started talking about how worthless he was, he thought he was going crazy, and everything he did was wrong and he couldn't understand why. He started crying and talked about committing suicide. He went upstairs to lay down and continued talking about how worthless he was. He then said he had something to tell me, but he couldn't because it was really terrible. I asked him if it would hurt me and he said yes. I told him I could handle it and that he should tell me. He proceeded to tell me that he knew who killed Pam and Trudy Poffel, that it was Mike Matusky. I asked him how he knew this and he said because he sat out in the car. I asked him why Mike would do something like that and he said it was because Mike hated Trudy and Pam for what they did to Ted. He said that he tried to talk Mike out of doing this. He said this discussion took place at Wargo's. I was shocked and told him I did not want to know anything else. He asked me what I was going to do with this information and I told him I did not know. He kept insisting that he did not do anything, and I told him that if he didn't he had nothing to worry about, but if he was in the car that he was an accessory. I asked how he could live with the fact that he knew what happened and he said that it had been bothering him for awhile, that was the reason why we hadn't been getting along. I told him I wasn't sure that I could keep this to myself, that it affected to (sic) many people. He said the police had no clue and

that Michael had gotten away with it. After he saw how upset I was, he then changed his story and told me it was all a lie, that he told me this story just to hurt me, since all I do is hurt him. I wasn't sure what to believe anymore. He became upset and angry. He kept insisting he was going to go to Loch Raven and commit suicide. I dropped him off at the bar and he came home about an hour later. I did discuss this matter with two of my friends. When he found this out he was very angry. I only told him the name of one person, and would not tell him the other. He was upset that I told anyone what he had told me in confidence. He was especially concerned about who the other person was. Over the next couple days, he asked me what I was going to do and I told him I was going to report to the proper authorities what he told me. He said we should discuss this first, because of the ramifications it could cause and that I really didn't know anything at all. He even picked up the phone himself and supposedly called 411 to get the number of the detective division and then faked a call to them, saying that he knew what happened. When he got off the phone I asked them what was said and he said the detectives would be here in an hour and then he said he didn't call, but gave me the number.

As a result of White's statement, both he and appellant were charged with the murders. Each was tried separately, with appellant's trial taking place first. When White refused to testify at appellant's trial, it was agreed that White was entitled to exercise his Fifth Amendment privilege and was therefore "unavailable."

Both sides sought a pre-trial in limine ruling on the admissibility of White's statement to Marchewka. Attaching the typewritten statement as an exhibit to its motion, the State urged that Marchewka be permitted to testify about White's "declaration against penal interest." We commend the procedure used to resolve this important issue. After hearing legal argument of counsel, the trial judge required that Marchewka

be called to the stand for questioning.[1] The following transpired during Marchewka's motion hearing testimony:

A. And he told me that he had something terrible he wanted to tell me but he was afraid it would hurt me and I said nothing could be that bad, he could tell me anything.

Q. When you told that to him what did he say next?

A. He told me that he knew who killed Pam and Trudy Poffel.

Q. What did you say?

A. I said who was it; he said it was Michael Matusky.

Q. Did he say how he knew that?

A. No, he did not.

Q. What else did he tell you about the killings of the Poffels?

A. He said that. I asked him why Michael would do something like that; he said it was because of what they did to Ted.

Q. When you say what they did to Ted, who are you referring to?

A. Pam and Trudy.

Q. Did Richard say where he was when Michael went into the Poffel home?

A. He was in the car.

Q. Did he indicate what he did while Michael was in the home?

A. No, he did not.

Q. Did he indicate whether or not they left together?

A. He said they left together, yes.

---

1. This opinion includes Marchewka's entire typewritten statement and much of her motion hearing testimony because a fact-intensive inquiry is necessary to determine how much—if any—of an alleged declaration against interest should be received into evidence. *Williamson v. United States,* —— U.S. ——, ——, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994). Appellant has never complained that Marchewka's trial testimony was at variance with her motion hearing testimony. The ruling that we review was based on the evidence presented at the in limine hearing. *State v. Jones,* 311 Md. 23, 29–30, 532 A.2d 169 (1987).

Q. Did Richard tell you that he and Michael had discussed this before going to the home?

A. Yes.

Q. Where did that conversation take place?

A. In the Pit and Wargo's.

Q. When he told you those things what was your reaction?

A. I was shocked. I told him I didn't want to know any more.

Q. When Richard saw you crying what, if anything, did he say?

A. He told me that he made this all up just to get back at me for all the times I have hurt him.

\* \* \*

Q. You said he wanted to talk to you but couldn't?

A. Right.

Q. Did that take place in the bar or in the car ride home?

A. In the car ride.

Q. At that point you noticed that he seemed entirely different than he had in the past?

A. Yes.

Q. You got home, he started talking about how worthless he was; didn't you say he thought he was going crazy?

A. Yes.

Q. He couldn't understand why. Then he started crying; is that correct?

A. Yes.

Q. Where was that?

A. In the kitchen and the bedroom.

Q. That is the first time you ever saw him cry?

A. To that extent, yes.

Q. He said he wanted to kill himself?

A. Yes.

Q. How many times did he say that?

A. Approximately 4 or 5 times.

Q. There no question in your mind that he was certainly emotionally distraught at that time; is that correct?

A. Yes.

Q. Much more than you had ever seen him?

A. Yes.

Q. Then he went upstairs and laid down and is that your testimony?

A. Yes.

Q. And did you go up there with him?

A. Yes, I did.

Q. You said he had something to tell you but he couldn't because it was terrible?

A. Yes.

Q. Then you said you could handle it and he should tell you, right?

A. Correct.

Q. Then he told you that he knew who killed Pam and Trudy Poffel?

A. Right.

Q. It was Michael Matusky?

A. Correct.

Q. He said he knew it because he sat in the car?

Q. Correct.

A. You said to him why would Mike do something like that; he said because Mike hated Trudy, correct?

A. Correct.

Q. He told you I tried to talk him out of doing this?

A. Right.

Q. He then asked you what you were going to do with this information and you told him you did not know, correct?

A. Yes.

Q. But he also insisted that he did not do anything wrong, correct?

A. Yes.

Q. He continually did that; is that correct?

A. Yes.

Q. And then after that he said it was all a lie anyway.

A. Yes.

Q. But basically your testimony is that he didn't admit doing anything, it was Michael, right?

A. Correct.

Q. He basically had information about Michael?

A. Yes.

Q. He felt he didn't have anything to worry about because he didn't do anything?

A. Yes.

Q. And that he was more emotionally distraught than you had ever seen him in your life?

A. Yes.

Q. He continually talked about committing suicide?

A. Not after that. Well, yes, he did.

Q. And he had drank a lot that day?

A. Yes.

Q. But the important thing he kept trying to reassure you he didn't do anything?

A. Correct.

\* \* \*

Q. And when he made that statement you took that to mean he didn't participate in the murder; is that right?

A. Yes.

Q. He didn't do the physical killing?

A. Yes.

Q. When Michael—excuse me—when Richard became concerned once he saw how upset you were, in addition to asking you what you were going to do with the information, he told you not to tell anyone, didn't he?

A. Yes, he did.

Q. How did he appear at that point, his emotional state, was he upset, scared?

A. He was scared.

Q. Right after he told you this information, Ms. Marchewka, he said he didn't do anything wrong, did you make a statement to him to the effect that if he drove and waited in the car that he was an accessory?

A. Yes, I did.

Q. When you made that statement to him what, if anything, did he do or say?

A. He didn't believe that.

■ The trial judge ruled that everything White said to Marchewka was admissible under the declaration against penal interest exception to the rule against hearsay. That in limine ruling was preserved for our review by a timely continuing objection requested by appellant's trial counsel and granted by the trial judge pursuant to Md. Rule 4–323(b). Eighteen days after that ruling, the Court of Appeals filed *Simmons v. State,* 333 Md. 547, 636 A.2d 463 (1994), holding that the declaration against penal interest is not—as a matter of Maryland evidence law—a "firmly rooted" exception to the rule against hearsay.[2] *Id.,* at 557–559, 636 A.2d 463 (1994). Seventy-seven days after the ruling, the Court of Appeals filed *Wilson v. State,* 334 Md. 313, 639 A.2d 125 (1994), holding that a declaration against penal interest is "presumptively unreliable." *Id.,* at 335, 639 A.2d 125. One hundred sixty-eight days after the ruling, the Supreme Court held that trial judges must exclude whatever non-self-inculpatory statements are contained in an otherwise admissible declaration against penal interest. *Williamson v. United States,* —— U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). We are required to apply those decisions as we review the trial judge's ruling. *McLain v. State,* 288 Md. 456, 463–470, 419 A.2d 369 (1980), *Smart v. State,* 58 Md.App. 127, 131, 472 A.2d 501 (1984).

---

2. Between the date of appellant's conviction and the date on which the *Simmons* opinion was filed, a jury acquitted White of both murders.

## WILSON V. STATE

In *Wilson*, the "crux of the question" before the Court of Appeals was:

> ... has the State, as the proponent of the evidence presumptively barred by the hearsay rule, carried its burden of proving that [the confession given by the co-defendant who asserted his Fifth Amendment privilege at trial] bore sufficient reliability to withstand scrutiny under the confrontation clause?

334 Md. at 335, 639 A.2d 125. Ryan Wilson and Perry Lee were found guilty of conspiracy to rob and accessory after the fact to a murder. After their motions for severance were denied, Wilson and Lee were tried together by a jury. Lee's voluntary confession was admitted into evidence over Wilson's objection. Wilson's convictions were affirmed by this court. *Wilson v. State*, 95 Md.App. 680, 622 A.2d 810 (1993).

The Court of Appeals reversed, four members opining that, in light of *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990),

> ... we are by no means content that the State overcame the jealously guarded presumption that the [co-defendant's confession] was untrustworthy. We believe that those circumstances did not show sufficiently that there were present the particularized guarantees of trustworthiness required to make the statement admissible ... We hold that the trial court erred in admitting it.

334 Md. at 337, 639 A.2d 125. Writing for the majority, Judge Orth (specially assigned) concluded that *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), and *Simmons, supra*, established the following principles:

1. Hearsay evidence admitted under the Confrontation Clause must be so trustworthy that cross-examination of the declarant would be of marginal utility.

2. Such trustworthiness can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.

3. Because it is not a firmly rooted exception to the rule against hearsay, a declaration against penal interest is "presumptively unreliable" and must therefore be excluded unless the court is persuaded that the declaration has "particularized guarantees of trustworthiness."

4. In shouldering its burden of persuasion on that issue, the State must confine its proof to the circumstances that surround the statement.

5. Other evidence that corroborates the declarant's version of the relevant event cannot be considered by the court when determining whether the circumstances render the declarant particularly worthy of belief.

### WILLIAMSON V. UNITED STATES

Williamson was convicted on the basis of out-of-court statements made by one Reginald Harris after Harris refused to testify at Williamson's trial. Harris, in the words of Justice Ginsburg, had been "caught red-handed with 19 kilos of cocaine ... admitted involvement, but did so in a way that minimized his own role and shifted blame to ... Williamson (and a Cuban man named Shawn)." —— U.S. at ——, 114 S.Ct. at 2439. Five Justices were of the opinion that some of Harris' statements were admissible and that—on remand—the trial judge must distinguish those statements that were truly self-inculpatory from those that were non-self-inculpatory.[3]

---

**3.** All nine Justices agreed that the judgment of conviction should be vacated. Four (Ginsburg, Blackmun, Stevens and Souter) were of the opinion that "none of Harris' hearsay statements were admissible under Rule 804(b)(3)." —— U.S. at ——, 114 S.Ct. at 2440. Justice Kennedy's concurring opinion (joined by Chief Justice Rehnquist and Justice Thomas) suggested

> ... the following approach with respect to statements against penal interest that inculpate the accused. A court first should determine whether the declarant made a statement that contained a fact against penal interest ... If so, the court should admit all statements related to the precise statement against penal interest, subject to two limits. Consistent with the Advisory Committee Note, the court should exclude a collateral statement that is so self-serving as to render it unreliable (if, for example, it shifts blame to someone else for a crime the defendant could have committed). In addition, in cases where

A majority of the Supreme Court agrees that Rule 804(b)(3) of the Federal Rules of Evidence does not authorize the admission of non-self-inculpatory statements, even if those statements are contained in a declaration that is self-inculpatory when examined as a whole.[4] As Justice O'Connor pointed out, "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Id.* at ——, 114 S.Ct. at 2435.

■ *Williamson* draws an important distinction between an extended narrative and each "statement" contained therein. Almost every declaration against interest will contain several "statements." When the declaration is an extended narrative, the admissibility of each "statement" must be evaluated separately. *Id.* at ——, 114 S.Ct. 2434. Our first task, however, is to determine whether it was error to admit *any* portion of White's statement.

---

the statement was made under circumstances where it is likely that the declarant had a significant motivation to obtain favorable treatment, as when the government made an explicit offer of leniency in exchange for the declarant's admission of guilt, the entire statement should be inadmissible.
—— U.S. at ——, 114 S.Ct. at 2445. Even under that approach, White's identification of appellant would be inadmissible. White blamed appellant for a crime that White could have committed.

4. At the time of appellant's trial, Maryland had by case law adopted the definition of a declaration against interest contained in Rule 804(b)(3) of the Federal Rules of Evidence. *Standifur v. State,* 310 Md. 3, 10–11, 526 A.2d 955 (1987). Our present declaration against interest exception to the rule against hearsay is contained in Maryland Rule 5–804(b)(3), which renders admissible

[a] statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, so tended to subject the declarant to civil or criminal liability, or so tended to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

## I

■ In order to determine whether there were sufficient indicia of reliability to admit anything White told Marchewka, the trial judge was required to examine the declaration as a whole as well as the totality of the circumstances under which White made his statements. Appellant argues that nothing White said was admissible because (1) White had no idea that Marchewka would repeat what he told her, and (2) White insisted that he had done nothing wrong. We disagree.

■ The declarant's expectation of confidentiality is a factor to be weighed. *Agnew v. State,* 51 Md.App. 614, 628, 446 A.2d 425 (1982). Such an expectation, however, does not require exclusion of a true declaration against interest. *Parks v. State,* 47 Md.App. 141, 147–149, 422 A.2d 384 (1981), *Adkins v. State,* 72 Md.App. 493, 506, 531 A.2d 699 (1987), reversed on other grounds, 316 Md. 1, 557 A.2d 203 (1989). "Acknowledgment of criminal activity is generally made only to confidants or to persons in whom the declarant imposes trust." *United States v. Goins,* 593 F.2d 88, 91 (8th Cir.1979).

■ As to the contention that White denied having done anything wrong, White acknowledged that he knew of appellant's intent to murder the victims when he drove appellant to and from the Poffel residence. Any reasonable person would appreciate the disserving nature of such a declaration. The trial judge found that, under the totality of the circumstances, a reasonable person in White's position would realize that he was making a declaration against his penal interest. That finding was not clearly erroneous. Statements made by White that were truly self-inculpatory were admissible under the declaration against interest exception to the rule against hearsay.

## II

■ We must now determine whether *all* of White's declaration was admissible. Applying *Simmons, Wilson,* and *Williamson* to the facts of this case, we conclude that the trial

judge should have excluded the statements in White's declaration that identified appellant as the killer and supplied appellant's motive for the murders. Those statements were simply not self-inculpatory as to White.

> ... The invocation of a name may be gratuitous, may be deliberately false in order to gain advantages for the declarant greater than those that would flow from naming a real participant or no one at all, ... or may represent an effort to gain some kind of personal revenge." [Footnote omitted.]

D. Davenport, The Confrontation Clause and the Coconspirator Exception in Criminal Prosecutions; A Functional Analysis, 85 Harv.L.Rev. 1378, 1396 (1972). With respect to those portions of the declaration in which White described his role, cross-examination of White would have been of marginal utility to appellant. The same cannot be said, however, about other statements in the declaration. It is obvious that appellant had an important interest in cross-examining White with respect to those portions of the declaration in which White (1) identified appellant as the killer and (2) discussed appellant's motive for the murders. Those statements should have been redacted from White's declaration against interest.

These conclusions are in accord with opinions interpreting *Williamson* in jurisdictions that recognize the declaration against penal interest exception to the rule against hearsay. See, *e.g., Smith v. State,* 647 A.2d 1083, 1088 (Del.Supr.1994), *People v. Spinks,* 206 Mich.App. 488, 522 N.W.2d 875, 878 (1994). If White is unavailable to testify when this case is tried again,[5] the State will be entitled to introduce those statements in his declaration to Marchewka that are truly self-inculpatory as to White himself,[6] and appellant will be entitled to the exclusion of those statements in White's declaration that (1) identify appellant as the person White drove to and from

---

**5.** See Md. Rule 5–804(a).

**6.** As is shown by the examples in *Williamson, supra,* —— U.S. at ——, 114 S.Ct. at 2436, such statements, when combined with other evidence, can be very helpful to the State's case.

the location of the murders, and (2) supply appellant's motive to commit the murders.

**JUDGMENTS REVERSED; COSTS TO BE PAID BY BALTIMORE COUNTY.**