639 A.2d 125

Ryan WILSON

v.

STATE of Maryland.

No. 72, September Term, 1993.

Court of Appeals of Maryland.

March 28, 1994.

Reconsideration Denied May 6, 1994.

314

Victoria S. Lansburgh, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

John J. Capowski, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI, ROBERT M. BELL, and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (Retired, Specially Assigned), JJ.

CHARLES E. ORTH, Jr., Judge (Retired) Specially Assigned.

I

On 6 January 1990 the body of Lawrence Berton Johnson was found on a parking lot in Prince George's County beside a Toyota automobile. The car's door was open and the engine was running. The manner of his death proved to be homicide and the cause of his death was a single gunshot wound to his head. Cash in the amount of $130 was on his person. Inside the car were numerous bags of cocaine, two pagers, $310 in cash and several pieces of paper bearing initials or names and phone numbers.

The police investigation of the crime led them to Anthony Brady Weston, Perry Wilson Lee and Ryan O'Neil Wilson.

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Five days after the murder, they were arrested. The Grand Jury for Prince George's County returned an indictment against them. All three were jointly charged with the premeditated murder of Johnson (1st count), the attempted robbery of Johnson with a deadly weapon (2nd count), conspiracy to rob Johnson with a deadly weapon (3rd count), and unlawfully using a handgun in the commission of a crime of violence (4th count). Wilson and Lee were jointly charged with the offense of accessory after the fact to the murder of Johnson (5th count).

The Circuit Court for Prince George's County denied a motion for severance, and on 2 April 1991 Wilson and Lee were tried together by a jury. Each of them was found guilty on the conspiracy charge and on the accessory charge and not guilty on the remaining charges. Wilson attempted to appeal from the judgments entered against him, but his appeal was deemed defective by the Court of Special Appeals and dismissed. He resorted to post conviction procedures, was granted the right to note a belated appeal and exercised the right. The Court of Special Appeals affirmed the judgments. *Wilson v. State*, 95 Md.App. 680, 622 A.2d 810 (1993). We issued a writ of certiorari upon Wilson's petition.[1]

## II

Detective Roger Irvin of the Prince George's County Police Department arrested Lee at Lee's home in Lanham, Maryland. Irvin transported Lee to the Department's Criminal

---

1. Lee filed a separate appeal. The Court of Special Appeals affirmed the judgments against him. *Lee v. State*, unreported, filed 20 March 1992. He did not seek the review of this Court by way of certiorari.

   Weston was separately tried by a jury in the Circuit Court for Prince George's County. He was found guilty of felony murder and murder in the second degree under the first count of the indictment, and of the crimes charged in the second count, the third count and the fourth count. The Court of Special Appeals affirmed the judgments entered on the convictions. *Weston v. State*, unreported, filed 1 April 1992. We denied his petition for a writ of certiorari. 327 Md. 525, 610 A.2d 797 (1992).

Investigations Division and interviewed him. Lee made a statement, which was reduced to writing and signed by him.

Special Agent Douglas Reardon of the Virginia State Police took Wilson into custody at St. Paul's College in Lawrenceville, Virginia, where Wilson was a student. After advising him that he was being arrested for capital murder, Reardon interviewed Wilson in the office of the Dean of Student Affairs. Wilson made a statement which was reduced to writing and signed by him. Later Wilson was further interviewed by Reardon in the Sheriff's office. The statement made by Wilson at that time was not transcribed but Reardon made "just about verbatim" notes of what Wilson said. Wilson signed the notes and wrote "voluntary statement" thereon. Detective Daniel Smart of the Prince George's County Police Department also obtained a statement from Wilson shortly after the interview by Reardon in the Sheriff's office. The statement was reduced to writing and signed by Wilson.

There was a plenary hearing on pretrial motions filed by Wilson and Lee to suppress their respective statements. The trial court denied the motions on the ground that a preponderance of the evidence established that they were freely and voluntarily made. They were thus available for presentation to the jury for its consideration as substantive evidence in the event that the jury found beyond a reasonable doubt that they were voluntary.

At trial, Lee's statement was admitted into evidence over Wilson's objection. As recited to the jury by Irvin, Lee said:

On January 6th, 1990 me, Anthony [Weston], Ryan [Wilson] went out in my father's gold Honda. Ryan had his father's D.C. police gun. We were going to rob a dope dealer. Anthony had the gun. We went around Dodge Park Apartments. There was no one out so we decided to leave. When I saw a car enter the apartment myself and Ryan were walking on the sidewalk. Anthony was about 15 feet in the street. That's when the car came back and Anthony said, "Are you looking?" I could not hear what the person said in the car. Then Anthony said, "Get on—get

the fuck out or on." The car stood for 30 seconds, then pulled in and parked. A male got out the car. He then reached back in the car and hit the horn and turned to Anthony and said putting his hands in the air "I'm the biggest dealer around here." Anthony then said, "No, fuck, you're not", and shot him. Anthony then ran. Me and Ryan walked away. I could not believe he had done that. I then got in my car, pick up Anthony, Ryan and talk about it and then dropped Ryan off and dropped Anthony off.

That narrative part of the statement was in Lee's handwriting. The statement continued in question and answer form, and was reduced to writing by Irvin.

Question number one: "What is Anthony's name?"

Answer: "Anthony Brady Weston."

Question number two: "What is Ryan's name?"

Answer: "Ryan O'Neil Wilson."

Question number three: "Where does Anthony live?"

Answer: "It's on Walkerton in Lanham, Maryland."

Question number four: "Where does Ryan live?"

Answer: "It's off of Hill Road somewhere. It's the first left after from the townhouses."

Question number five: "What day did this occur?"

Answer: "Friday night—Saturday morning."

Question number six: "At approximately at what time did this occur?"

Answer: "About 5:30 to 6:00 in the morning a.m."

Question number seven: "What car were the three of you in?"

Answer: "It's my father's '89 gold Honda, Maryland tag. I don't know the number."

Question number eight: "Who had the gun?"

Answer: "It was Ryan's father's gun, but Anthony had the gun."

Question number nine: "Describe the gun."

Answer: "It's a black gun with a brown handle, .38 Special with D.C. Cop written all over it."

Question number ten: "How was Anthony carrying the gun?"

Answer: "It was under his jacket."

Question number eleven: "Where did the three of you go on Saturday, January the 6th, 1990?"

Answer: "Dodge Park Road in Landover, Maryland."

Question number twelve: "Why did the three of you go there?"

Answer: "To rob someone with cocaine."

Question number thirteen: "How did the shooting occur?"

Answer: "Me and Ryan were walking down the sidewalk and we walked a couple of apartments down and came back. There were a couple people out there. They said that they did not have anything. We were leaving. Me and Ryan were on the sidewalk. Anthony was ten to fifteen feet behind us and he was in the street. That's when a car came in. The car went down about three buildings and it looked like he was dropping somebody off. Meanwhile, we were calling Anthony and saying, 'Come on, Anthony, let's go.' The car came back and Anthony said, 'Are you looking for something?' He said that the—he said that to the guy in the car. I couldn't hear what the guy said. The car pulled in front of the building where he was shot at. The guy got out of the car. He was rolling down his window. When he was doing this he reached back in the car and blew the horn three times. He was facing the building. Anthony was behind him. The guy turned around and threw his hands in the air and said, 'I'm the biggest hustler around here.' And Anthony said, 'No, you're not. I am.' The whole time the gun was at his head. At first the guy hit the gun away and then Anthony shot the gun and then Anthony run down the street to the 25 Hour store. I walked to the car. Ryan left. He walked towards the store. I drove and picked up Ryan first and then Anthony. We talked driving home and I

asked Anthony why he did that. He didn't say why he did it. I dropped Ryan off, then Anthony at their homes."

Question number fourteen: "What happened to the gun?"

Answer: "Anthony gave it to Ryan. I don't know what Ryan did with the gun."

Question number fifteen: "How many times did Anthony shoot the black male on Dodge Park Road."

Answer: "Once."

Question number sixteen: "Did you tell anybody about this incident?"

Answer: "My girlfriend. I don't want to tell you her name."

Question number seventeen: "Do you remember what Anthony was wearing that night?"

Answer: "He was wearing a blue Dallas coat and a pair of jeans."

Question number eighteen: "What did you have on that night?"

Answer: "A gray coat, blue jeans and some boots."

Question number nineteen: "How about Ryan?"

Answer: "I'm not sure."

Question number twenty: "Did the guy Anthony [shot] have any type of weapon?"

Answer: "From the distance that I was at, no."

Question number twenty-one: "How far from Anthony were you when he shot the black male?"

Answer: "Approximately ten to fifteen feet."

Question number twenty-two: "Did Anthony take anything from the black male that he shot?"

Answer: "No."

Question number twenty-three: "Did you waive your rights freely and knowingly?"

Answer: "Yes. It was something that had to be done."

Question number twenty-four: "Is the statement accurate as to what you told me?"

Answer: "It can't get not better than it is."

Question number twenty-five: "Is this the truth?"

Answer: "To be honest the honest to God truth."

Question number twenty-six: "Are you under the influence of any drug or narcotic?"

Answer: "No, I'm not."

The autopsy report, a diagram of the crime scene and testimony as to what was found there, the gun and testimony as to the recovery of the gun and bullets in Wilson's home, and testimony and documents relating to the voluntariness of the statements were also received in evidence. There was no other evidence adduced by the State except the two men's statements. Each of the defendants opted not to testify and no other evidence was offered in their behalf. Motions for judgments of acquittal were denied.

## III

The sole question Wilson asks us to determine boils down to whether the trial court abused its discretion in admitting Lee's statement. We consider Wilson's challenge only with respect to the Confrontation Clause of the Sixth Amendment to the Constitution of the United States [2] and on the common law hearsay rule.

In its guise as substantive evidence against Wilson, Lee's statement was hearsay.[3] In its posture as substantive evi-

---

**2.** The Confrontation Clause of the Sixth Amendment to the Constitution of the United States declares:

In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....

The confrontation requirements of the Sixth Amendment are applicable to the states through the Fourteenth Amendment. *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Franklin v. State,* 239 Md. 645, 647–648, 212 A.2d 279 (1965).

**3.** The Supreme Court noted in *Lee v. Illinois,* 476 U.S. 530, 543 n. 4, 106 S.Ct. 2056, 2064 n. 4, 90 L.Ed.2d 514 (1986):

dence it also invoked the Confrontation Clause of the Sixth Amendment to the United States Constitution. The basic rule as to hearsay bars its admission in evidence.

> If one were to read [the language of the Confrontation Clause of the Sixth Amendment] literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial.

*Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (citation omitted). The Court noted:

> But, if thus applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme.

*Id.* In *Idaho v. Wright*, 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638 (1990), the Court declared:

> From the earliest days of our Confrontation Clause jurisprudence, we have consistently held that the Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause.

The Supreme Court has recognized that hearsay rules and the Confrontation Clause are "generally designed to protect similar values" but it has "been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements." *Id.* at 814, 110 S.Ct. at 3146 (citations omitted). "Both," however, "express a preference for a personal examination of a declarant as a means of testing the veracity and accuracy of a witness's testimony." *Chapman v. State*, 331 Md. 448, 453, 628 A.2d 676 (1993). By the refusal of the Court to equate the protections of the Confrontation Clause with the common law rules

---

We have previously turned to McCormick's definition of hearsay as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." E. Cleary, McCormick on Evidence § 246, p. 584 (2d ed. 1972).

regarding the admission of hearsay in criminal trials, the Confrontation Clause may bar "the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Wright,* 497 U.S. at 814, 110 S.Ct. at 3146.

In *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538, the Court set forth "a general approach" for determining when incriminating statements admissible under exceptions to the hearsay rule also meet the requirements of the Confrontation Clause. The general approach has two aspects. The first is that a "rule of necessity" must be satisfied. *Roberts* declared this rule was established by the Sixth Amendment "in conformance with the Framers' preference for face-to-face accusation." *Id.* The second comes into play only upon satisfaction of the rule of necessity. The hearsay statement is then admissible provided it bears "adequate 'indicia of reliability.'" *Id.* at 66, 100 S.Ct. at 2539. The *Roberts* approach was recognized and applied by the Court in *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). It was iterated and applied in *Wright,* 497 U.S. at 814–815, 110 S.Ct. at 3145–3146. We quoted and applied it in *Chapman,* 331 Md. at 455–456, 628 A.2d 676.

### A

■ One of the ways the rule of necessity called for in the first aspect of the *Roberts* approach may be satisfied is by proving that the hearsay declarant is unavailable. *See Chapman,* 331 Md. at 470, 628 A.2d 676. A declarant is "unavailable" when the proponent demonstrates that he has been unable to procure the attendance of the absent witness by process or other reasonable means. *See* Fed.Rule Evid. 804(a)(5).[4]

---

**4.** The first prong of the *Roberts* approach was construed as requiring the showing of the unavailability of the declarant or a demonstration of unsuccessful good faith efforts to secure the declarant's presence. *Chapman v. State,* 331 Md. 448, 467, 628 A.2d 676 (1993). Then, in

324

## B

■ "Indicia of reliability" translates into a "showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539; *Lee v. Illinois*, 476 U.S. at 543, 106 S.Ct. at 2063. If the hearsay at issue possesses "particularized guarantees of trustworthiness," it can be admitted into evidence despite the general rule barring a trier of fact from considering hearsay. *See Lee v. Illinois*, 476 U.S. at 543, 106 S.Ct. at 2063. In *Lee v. Illinois*, the Court considered the circumstances surrounding the hearsay statement, *id.* at 544–545, 106 S.Ct. at 2064, and the "interlocking" nature of the codefendant's and defendant's confessions to determine whether the codefendant's confession enjoyed the required "particularized guarantees of trustworthiness," but did not rely on corroborative *physical* evidence. *Id.* at 545–546, 106 S.Ct. at 2064. In *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), the Court also turned to the interlocking nature of the codefendant's hearsay statement and the defen-

*United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Court declared:

Roberts cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable.

*Id.* at 394, 106 S.Ct. at 1125. It held that the unavailability of a conspirator need not be shown to admit a coconspirator's hearsay declaration made during the course of the conspiracy. *Id.* at 398–400, 106 S.Ct. at 1127–1128. In *White v. Illinois*, —— U.S. ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Court again indicated that the unavailability requirement established in *Roberts* does not apply to all forms of hearsay. *Id.* —— U.S. at ——, 112 S.Ct. at 741–742. The Court held that

the Confrontation Clause does not require an initial showing of unavailability prior to admitting out-of-court statements which are spontaneous declarations or are made for the purposes of attaining medical diagnosis or treatment as substantive evidence for the State's case.

*Chapman*, 331 Md. at 469–470, 628 A.2d 676, citing to *White*, —— U.S. at ——, 112 S.Ct. at 743. Thus, *Chapman* concluded, "it appears that the Supreme Court has emphasized that *Roberts* contemplated a rule of necessity, not one of availability." 331 Md. at 470, 628 A.2d 676. So, in *Chapman*, we held that the unavailability of the makers of reliable business records was not a prerequisite for the admission of these records.

dant's statement to corroborate the reliability of the hearsay statement. The Court said:

Quite obviously, what the "interlocking" nature of the codefendant's confession pertains to is not its *harmfulness* but rather its *reliability:* If it confirms essentially the same facts as the defendant's own confession it is more likely to be true.

481 U.S. at 192, 107 S.Ct. at 1718 (emphasis in original). The Court continued:

Its reliability, however, may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be *admitted as evidence* against the defendant, see *Lee v. Illinois,* 476 U.S. 530 [106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) ]....

481 U.S. at 192–193, 107 S.Ct. at 1718–1719 (emphasis in original). The Court flatly stated, at 193–194, 107 S.Ct. at 1719:

Of course, the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient "indicia of reliability" to be directly admissible against him (assuming the "unavailability" of the codefendant) despite the lack of opportunity for cross-examination, see *Lee,* supra, 476 U.S. at 543–544, 106 S.Ct. at 2063–2064; *Bruton [v. United States,* 391 U.S. 123] at 128, n. 3, [88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ] ... and may be considered on appeal in assessing whether any Confrontation Clause violation was harmless, see *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

In *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, the Court suggested that the "indicia of reliability" requirement is met where the hearsay statement "falls within a firmly rooted hearsay exception."

Admission [of a hearsay statement] under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements.

*Wright,* 497 U.S. at 817, 110 S.Ct. at 3147 (citations omitted). *See Chapman,* 331 Md. at 456–457, 628 A.2d 676. In such instance, "no independent inquiry into reliability is required. . . ." *Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

"In sum," the Court declared in *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539 (footnote omitted), the statement of a hearsay declarant not present for cross-examination

> is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

As we have seen, the Court had made clear that the cross-corroboration of the codefendant's hearsay statement and the defendant's statement was relevant in determining whether the hearsay statement was cloaked with "particularized guarantees of trustworthiness."

## IV

On 27 June 1990, the Supreme Court decided *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), which confirmed existing law with one significant exception: the use of corroborating evidence in determining the trustworthiness of certain hearsay statements. The case required the Court

> to decide whether the admission at trial of certain hearsay statements made by a child declarant to an examining pediatrician violates a defendant's rights under the Confrontation Clause of the Sixth Amendment.

*Id.* at 808, 110 S.Ct. at 3143. In reaching its decision, the Court applied the *Roberts* approach. The trial court had found that the hearsay declarant was incapable of communicating with the jury and defense counsel agreed. The appellate court had neither questioned this finding nor discussed the general requirement of necessity. Therefore, for the purpose of decision, the Court assumed that the declarant "was an unavailable witness within the meaning of the Con-

frontation Clause." *Id.* at 816, 110 S.Ct. at 3147. The Court then looked at the second aspect of the *Roberts* approach.

The crux of the question presented is therefore whether the State, as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause, has carried its burden of proving that [the declarant's hearsay statements] bore sufficient indicia of reliability to withstand scrutiny under the Clause.

*Id.* It first noted that the hearsay exception before it was not a firmly rooted one so as to satisfy the constitutional requirement of reliability without more ado. *Id.* at 817, 110 S.Ct. at 3147. Rather, the hearsay exception to be admissible had to be distinguished by "particularized guarantees of trustworthiness." *Id.* at 817–820, 110 S.Ct. at 3147–3149. The Court observed that courts have considerable leeway in their consideration of appropriate factors to determine the existence of particularized guarantees of trustworthiness; it "decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause." *Id.* at 822, 110 S.Ct. at 3150. The statement and the circumstances surrounding the obtaining of it, however, were factors to be considered. *Id.* at 819, 110 S.Ct. at 3148.

To this point, the Court was in full accord with the reasoning and declarations of its prior cases. Although the Court had plainly stated before that the "interlocking" of a codefendant's hearsay statement with that of a defendant's statement was a proper factor to consider in ascertaining the reliability of the hearsay statement, it announced in *Wright* that this was not so. It declared that

"particularized guarantees of trustworthiness" must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief.

497 U.S. at 819, 110 S.Ct. at 3148. It repeated this belief at 820, 110 S.Ct. at 3149. It averred, at 822, 110 S.Ct. at 3150:

[W]e are unpersuaded by the State's contention that evidence corroborating the truth of a hearsay statement may

properly support a finding that the statement bears "particularized guarantees of trustworthiness."

"To be admissible under the Confrontation Clause," the Court declared,

hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.

*Id.* The Court declaimed at 823, 110 S.Ct. at 3150:

In short, the use of corroborating evidence to support a hearsay statement's "particularized guarantees of trustworthiness" would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility.

*Wright* observed, however:

[W]e think the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy.

497 U.S. at 823, 110 S.Ct. at 3150.

■ We have examined over 100 cases to ascertain how the courts in other jurisdictions, both federal and state, have dealt with *Wright.* The cases are not confined to allegations of child abuse, with which *Wright* was concerned, but cover many kinds of factual situations, including the situation before us: a hearsay statement by an accomplice inculpating a defendant. They have applied *Wright,* but not always with enthusiasm,[5] as meaning precisely what it says, namely, that the reliability of a hearsay statement shall be determined only from the statement itself and the circumstances surrounding it; other evidence, testimonial and physical, including the statement of a

_____ .

5. *See George v. State,* 306 Ark. 360, 818 S.W.2d 951, 952–953 (1991) (Glaze, J., concurring); *Vann v. State,* 309 Ark. 303, 831 S.W.2d 126, 130 (1992) (Glaze, J., concurring); *Bockting v. State,* 109 Nev. 103, 847 P.2d 1364, 1369–1370 n. 8 (1993).

codefendant, shall not be considered, no matter to what extent that evidence tends to corroborate the hearsay statement. *See*, for example, *Government of Virgin Islands v. Joseph*, 964 F.2d 1380, 1387–1388 (3d Cir.1992); *United States v. Ellis*, 951 F.2d 580, 582 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3030, 120 L.Ed.2d 901 (1992); *United States v. Flores*, 985 F.2d 770, 775–777 (5th Cir.1993); *United States v. Gomez–Lemos*, 939 F.2d 326, 332 (6th Cir.1991); [6] *United States v. Harty*, 930 F.2d 1257, 1263 (7th Cir.), *cert. denied sub nom.*, —— U.S. ——, 112 S.Ct. 262, 116 L.Ed.2d 215 (1991); *Ring v. Erikson*, 983 F.2d 818, 821 (8th Cir.1993); *Swan v. Peterson*, 6 F.3d 1373, 1379–1380 (9th Cir.1993); *United States v. Accetturo*, 966 F.2d 631, 634 (11th Cir.1992), *cert. denied sub nom*, —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *State v. Ruelas*, 174 Ariz. 37, 846 P.2d 850, 853 (Ariz.App.1992); *George v. State*, 306 Ark. 360, 813 S.W.2d 792, 796, *modified*, 306 Ark. 360, 818 S.W.2d 951 (1991); *People v. March*, 250 Ill.App.3d 1062, 189 Ill.Dec. 456, 620 N.E.2d 424, 433 appeal denied, 153 Ill.2d 566, 191 Ill.Dec. 625, 624 N.E.2d 813 (1993); *People v. Dhue*, 444 Mich. 151, 506 N.W.2d 505, 512 (1993); *State v. Edwards*, 485 N.W.2d 911, 915 (Minn.1992); *State v. Goldenstein*, 505 N.W.2d 332, 343 (Minn.App.1993); *Felix v. State*, 109 Nev. 151, 849 P.2d 220, 240 (1993); *State v. Nielsen*, 316 Or. 611, 853 P.2d 256, 267 (1993); *State v. Whelchel*, 115 Wash.2d 708, 801 P.2d 948, 957 (1990); *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843, 850 (1990); *State v. Oliver*, 161 Wis.2d 140, 467 N.W.2d 211, 214 n. 4 (Wis.App.1991).

## V

### A

The sole question Wilson presented before the Court of Special Appeals was whether the trial court erred in admitting

---

**6.** The Sixth Circuit in *United States v. Gomez–Lemos*, 939 F.2d 326, 332 (6th Cir.1991) went so far as to say that in *Wright* the Supreme Court "reversed itself on the question of whether corroboration from other witnesses may be considered in evaluating whether hearsay testimony meets the reliability requirements of the Confrontation Clause."

Lee's statement. The heart of his argument that the trial court erred was that his statements and Lee's hearsay statement did not "interlock" sufficiently to overcome the presumption that the hearsay statement of a jointly tried codefendant implicating a defendant is presumptively unreliable. Wilson cited to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), and *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). The State responded by asserting that the trial court did not err because Lee's confession and Wilson's confession were substantially identical, because the circumstances surrounding Lee's confession evinced its reliability, and because any error committed was harmless. Neither Wilson nor the State made even passing reference to *Wright*, although *Wright* was decided some nine months before Lee was tried.

The Court of Special Appeals in affirming the judgments against Wilson found the law to be well established that

ordinarily the confession of an accomplice may not be introduced at his and another's joint trial when the confession implicates the latter in the crime as well as the former, and the former is not available for cross-examination, despite an instruction to the jury to disregard the implicating confession against the co-defendant.

*Wilson v. State*, 95 Md.App. at 688, 622 A.2d 810. Pointing to *Bruton*, the intermediate appellate court said that "[s]uch hearsay confessions of an accomplice that incriminate defendants are presumptively unreliable." *Id.* Relying on the teachings of *Lee v. Illinois* and *Cruz*, the court believed, however, that the *Bruton* presumption was overcome because Lee's confession and Wilson's confession were "substantially identical in all significant aspects," and that "[i]mportantly the circumstances of the actual taking of the independent confessions further demonstrate their strength and reliability." 95 Md.App. at 693–694, 622 A.2d 810. The Court of Special Appeals held that

the *Bruton* rule does not apply in the context of the matter before us. The independent circumstances surrounding the taking of the confessions, in addition to their significantly interlocking detail of material aspects, clearly evidenced sufficient indicia of reliability to rebut the presumption of unreliability of the co-defendant's confession and was properly admitted as direct evidence against [Wilson].

95 Md.App. at 694–695, 622 A.2d 810. *Wright* did not enter into the intermediate appellate court's resolution of the question—that case was not even cited. The court concluded:

In any event, even assuming that the non-testifying codefendant's confession was not directly admissible against [Wilson], we believe that under the facts and circumstances of this case, wherein [Wilson's] independent confession supported the co-defendant's, the Confrontation Clause violation was harmless.

*Id.* at 695, 622 A.2d 810.

### B

The question presented to us on certiorari is:

Whether the Court of Special Appeals erred in holding that it was proper ... for the trial court to have allowed the State to introduce as substantive evidence against [Wilson] a confession made by a non-testifying codefendant [Lee] in which [Wilson] was implicated in the crimes.

By the time the case reached us, Wilson's counsel had discovered *Wright.* Contending that the Court of Special Appeals erred, Wilson recognizes the *Bruton* rule of presumptive unreliability and the teachings of *Lee v. Illinois* regarding the rule. But for the first time he calls upon the dictates of *Wright* to buttress his contention that the trial court erred in admitting Lee's statement and that the Court of Special Appeals therefore erred in affirming the judgments. Wilson argues that under the restraints imposed by *Wright*, the "interlocking" of Lee's statement and Wilson's statements may not be used to evaluate the reliability of Lee's statement, and that its contents plus the circumstances surrounding the ob-

taining of it were not sufficient to overcome the presumption of unreliability with which the statement was burdened. In other words, whether or not Wilson's statements and Lee's statement contained "significantly interlocking detail of material aspects," *see Wilson*, 95 Md.App. at 694–695, 622 A.2d 810, is irrelevant with respect to a determination whether Lee's statement was sufficiently trustworthy to overcome the weighty presumption that it was not reliable so as to justify its admission in evidence against Wilson. Wilson further urges that if the admission of Lee's statement was error, the error was not harmless because the confessions of Wilson and Lee, even though "similar in many respects," were "hardly identical" and the State "urged the jury to consider the *combined* effect of the various statements in determining [Wilson's] guilt."

The State, seeing no error, counters by asserting that the circumstances surrounding Lee's confession show sufficient indicia of reliability for its admission. It urges that the timing of the confession, its voluntariness, its exculpatory nature, and its lack of a vengeful motive provide sufficient indicia of reliability to warrant its admission. Finally, the State claims that the admission of Lee's statement, if error, was harmless.

## C

We first observe that it is perfectly clear from the prosecutor's opening statement and her closing arguments at trial, that if the jury found the confessions to be voluntary, it could consider them together as substantive evidence of the guilt of both Lee and Wilson. In other words, Lee's confession was not offered by the State only as evidence of his guilt, but also as evidence of Wilson's guilt. By the same token, Wilson's confession was offered not only as evidence of his guilt, but also as evidence of Lee's guilt. That is, each confession could be considered by the jury in conjunction with the other to establish the guilt of both defendants. Neither Lee's attorney nor Wilson's attorney contested this notion. In fact, in their closing arguments to the jury, focusing primarily on the murder charges, they obviously embraced the view that the

confessions should be so considered; they spoke in terms of each confession showing the truth of the other, establishing that neither Lee nor Wilson intended to commit murder. There was nothing in the court's instructions to the jury, accepted by counsel, to suggest that the two confessions were not to be considered as an entry, and nothing that had been said by the court or counsel at the pretrial hearing to suppress the confessions suggested otherwise.

We follow the established *Roberts* approach in the light of the dictates of *Wright* to determine whether the trial judge erred in admitting Lee's statement. Wilson is entitled to a new trial if the judge was wrong and the error was not harmless; the judgments stand if the judge was right, even if for the wrong reasons. Cf. *Securities and Exchange Com. v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980); *Aubinoe v. Lewis*, 250 Md. 645, 649, 244 A.2d 879 (1968).

## VI

### A

First, we must decide whether the *Roberts* "rule of necessity" requirement has been satisfied. As we noted above, one way to accomplish this task is to show that the hearsay declarant is unavailable.

Lee, the declarant of the hearsay statement, was an accomplice of Wilson, against whom the State sought to place the statement in evidence. The two were jointly tried, a motion for severance having been denied by the trial court. Although Lee was physically present in the courtroom, he invoked his right not to testify. As Lee was a defendant, the State could not call him as a witness. And the failure of Lee to testify did, of course, preclude the cross-examination of him by Wilson. *See Bruton*, 391 U.S. at 132, 88 S.Ct. at 1625–1626; *Douglas v. Alabama*, 380 U.S. at 419, 85 S.Ct. at 1077; *Phillips v. Wyrick*, 558 F.2d 489, 494 (8th Cir.1977), *cert.*

*denied,* 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978); *State v. Whelchel, supra,* 801 P.2d at 952–953.

> [It] is the generally accepted notion that witnesses who successfully invoke the privilege against self-incrimination are "unavailable" for purposes of determining whether their prior statements are admissible under an exception to the hearsay rule. *See California v. Green,* 399 U.S. [149] at 168, n. 17, 90 S.Ct. [1930] at 1940, n. 17 [26 L.Ed.2d 489 (1970) ]; Fed.Rule Evid. 804(a)(1); E. Cleary, McCormick on Evidence § 253 (3d ed. 1984).

*Lee v. Illinois,* 476 U.S. at 550–551, 106 S.Ct. at 2067 (Blackmun, J., dissenting).

### B

■ In *Douglas v. Alabama,* 380 U.S. at 419, 85 S.Ct. at 1077, the Court held that the defendant's "inability to cross-examine [the accomplice] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause."

> This holding, on which the Court was unanimously agreed, was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination.[7]

*Lee v. Illinois,* 476 U.S. at 541, 106 S.Ct. at 2062. Over the years since *Douglas,* the Court pointed out, "[i]t has spoken

---

7. The Supreme Court stated that it cannot be seriously doubted
    > ... that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him.

   *Lee v. Illinois,* 476 U.S. at 539, 106 S.Ct. at 2061, quoting *Pointer v. Texas,* 380 U.S. at 404, 85 S.Ct. at 1068. The Court quoted *Pointer* as observing that
    > [t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

   476 U.S. at 540, 106 S.Ct. at 2061.

with one voice in declaring *presumptively unreliable accomplices' confessions that incriminate defendants. " Id.* (emphasis added).

The presumption of unreliability, however, may be rebutted. *Id.* at 543, 106 S.Ct. at 2063. The rebuttal invokes the second aspect of the *Roberts* approach, namely, that the hearsay statement must bear adequate "indicia of reliability" to be admissible. This brings us to the crux of the question before us: has the State, as the proponent of evidence presumptively barred by the hearsay rule, carried its burden of proving that Lee's statement bore sufficient reliability to withstand scrutiny under the Confrontation Clause?

We emphasize that the Supreme Court has long looked with a jaundiced eye upon hearsay statements by accomplices that implicate defendants in criminal proceedings. The Court imposes a heavy burden on the proponent for admission of such a statement; the presumption of unreliability is not easily rebutted. The rebuttal is rendered even more difficult than it was pre-*Wright.* As noted above, the *Wright* dictates severely restrict the factors that may be considered to determine particularized guarantees of trustworthiness; they are confined to the statement itself and to the circumstances surrounding the obtaining of that statement, without resort to any corroborative evidence, including a hearsay statement by a codefendant.

We first observe that the voluntariness of Lee's statement is not now contested. We next note that the admissibility of the statement rested on the penal interest exception to the hearsay rule. The penal interest exception has not been accepted as a firmly established one.[8] *See Simmons v. State,* 333 Md. 547, 557–559, 636 A.2d 463, 468–469 (1994). Thus Lee's statement was presumptively unreliable. The State then had the burden of rebutting this presumption by establishing from the

---

**8.** The Supreme Court has indicated several classic hearsay exceptions that fall within the "firmly rooted" category. A declaration against penal interest is not one of them. *See Chapman,* 331 Md. at 457 n. 3, 628 A.2d 676.

totality of the circumstances that there were sufficient indicia of reliability in accord with *Wright* to render the statement admissible. The Supreme Court, as we have seen, gave the courts considerable leeway as to the factors to be considered in showing the existence *vel non* of particularized guarantees of trustworthiness, but it refused to endorse a mechanical test to be applied. We examine Lee's statement and the circumstances surrounding the obtaining of it.

Lee was arrested at his home early in the morning under the authority of a warrant by an array of police officers including an "EST team" that "made entry" to the house. Detective Irvin told him that "[h]e was arrested for murder." The police took him to the Criminal Investigations Division where he was handcuffed to a wall of a six foot by eight foot interview room. The interrogation was neither taped nor taken down by a stenographer. Inside the interview room, Lee was alone except for Irvin, one of the officers who had arrested him less than an hour before. It was in this setting that the detective drew from Lee the incriminating words the State eventually used against Wilson, who was arrested that same day in Virginia by other law enforcement authorities.

Irvin asked Lee about the murder and "verbally he told me, and then I asked him to write a statement which he did." Then the detective posed some 20 specific questions "[t]o clarify some of the things in the statement and to also make the statement more to the fact as to what happened." Irvin would "type in the question and [Lee] would give me an answer which I would type." By no stretch of the imagination was the statement an outburst or a spontaneous explanation of events;[9] it was the product of a deliberate and particularized police interrogation. Lee incriminated his cohort by asserting that Wilson supplied the murder weapon and the bullets, turned the gun over to Weston to rob a dope dealer and was present when Johnson was shot. And Lee's recounting of the

---

**9.** "A statement's spontaneity is an important factor in determining reliability under the confrontation clause." *State v. Cook*, 135 N.H. 655, 610 A.2d 800, 806 (1992), citing *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970).

events surrounding the shooting of Johnson tended to show that Wilson had also committed the crimes of felony murder, attempted robbery, conspiracy to rob and accessory after the fact.

It is apparent that Lee had a motive to lie. He would naturally want to deflect blame for the murder from himself, so he told police that Weston was the trigger man and that he had nothing to do with the shooting. "I could not believe he had done that," Lee claimed. Later he added that he had asked Weston why he had shot Johnson but Weston gave no reason. A "reality of the criminal process," the Supreme Court noted in *Lee v. Illinois*, is

> that once partners in a crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.

476 U.S. at 544–545, 106 S.Ct. at 2064. "Taking on the full blame for a minor role in an offense ... does little to demonstrate trustworthiness because the declarant still has the motive to shift the blame to others so as to receive a lesser penalty." *United States v. Flores*, 985 F.2d at 782.

Lee's character, as revealed by his own words, also made his statement suspect. They showed that he was not averse to engaging in criminal conduct. He admitted that he had freely joined Wilson and Weston to rob drug dealers.

From our perusal of the totality of the circumstances surrounding the obtaining of Lee's statement, in light of *Wright*, we are by no means content that the State overcame the jealously guarded presumption that the statement was untrustworthy. We believe that those circumstances did not show sufficiently that there were present the particularized guarantees of trustworthiness required to make the statement admissible. In short, the statement was not reliable. We hold that the trial court erred in admitting it.

## VII

Our final inquiry is whether the error was harmless. As noted *supra*, *Wright* indicated that the interlocking nature of a declarant's hearsay statement and a defendant's state-

ment may be considered in determining whether any error in admitting the hearsay statement might be harmless. 497 U.S. at 823, 110 S.Ct. at 3150. But even so, we believe that the erroneous admission of Lee's statement was not harmless. The harmless error rule we adopted in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976) is more demanding than the prejudicial error test in civil cases. *See id.* at 659, n. 15, 350 A.2d 665. We concluded in *Dorsey:*

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, *beyond a reasonable doubt, that the error in no way influenced the verdict,* such error cannot be deemed "harmless" and a reversal is mandated.

*Id.* at 659, 350 A.2d 665 (emphasis added). We stressed:

> Such reviewing court must thus be satisfied that there is *no reasonable possibility that the evidence complained of—* whether erroneously admitted or excluded—*may have contributed to the rendition of the guilty verdict.*

*Id.* (emphasis added).

Lee's statement and Wilson's statements were the heart of the State's case. There was no other evidence legally sufficient to establish Wilson's guilt of any of the crimes charged. On our independent review of the record, we find that the Court of Special Appeals was correct in observing that Wilson's statements and Lee's statement were substantially alike in all significant aspects. The statements "interlocked" and cross-corroborated each other; the discrepancies in them were not substantial; the differences in them were no more than irrelevant and trivial. Although Wilson's statements as well as Lee's statement tended to exculpate Wilson with respect to the murder, they showed that Wilson committed the other crimes charged, including conspiracy and accessory after the fact, the offenses of which he was convicted. Thus Wilson's own statement to the effect that he had committed crimes other than the murder was corroborated and strongly buttressed by Lee's statement. In those circumstances, with Lee's statement before the jury as substantive evidence

against Wilson, we are unable to declare a belief, "beyond a reasonable doubt, that the error [in admitting Lee's statement] in no way influenced the verdict." And we are not satisfied that "there is no reasonable possibility that [Lee's statement] ... may have contributed to the rendition of the guilty verdict[s]." We conclude that the erroneous admission of Lee's statement was not harmless.

We hold that the trial court erred in permitting Lee's statement to be placed in evidence. It follows that the Court of Special Appeals was wrong in affirming the judgments entered by the Circuit Court for Prince George's County. We reverse its judgment. Wilson is entitled to a new trial.[10]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;*

*CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO VACATE THE JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL;*

*COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.*

Dissenting Opinion by RODOWSKY, J., in which McAULIFFE and KARWACKI, JJ., join.

---

10. On the retrial of Wilson, in the light of our opinion, Lee's statement would be inadmissible. The State could proceed on the basis of Wilson's statement, which has been established as being voluntary, and such other evidence it may adduce supporting the statement and tending to show Wilson's guilt of the crimes charged.

Had the judge properly ruled that Lee's statement was inadmissible against Wilson, he would be in a quandary as to how to proceed in a joint trial in the light of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This points up the advisability that in circumstances such as here, where there are jointly charged defendants, each of whom has confessed, not to try them jointly but to sever them for trial. Whether there can be an exception to the *Bruton* dictates in the circumstances here so as to permit a limiting instruction is not before us; no such instruction was requested. That question is left for another day.

RODOWSKY, Judge, dissenting.

I respectfully dissent. The error is harmless beyond a reasonable doubt. Further, even if the error were not harmless, this Court should not rule now that "Lee's statement would be inadmissible" on the retrial of Wilson. 334 Md. 313, 339 n. 10, 639 A.2d 125, 138 n. 10 (1994).

## I

Under all of the evidence, it was undisputed that Weston was the shooter, that Lee furnished the car and was the driver, and that Wilson furnished the handgun. The general object of the joint enterprise, robbing one or more drug dealers, led Wilson to furnish the handgun on the night of the murder. Wilson gave one oral and three written confessions that acknowledged the undisputed facts. Wilson's defense strategy was to convince the jury that Weston and the murder victim became involved in a personal altercation, distinct from any attempted robbery, and Wilson used Lee's statement to support that argument. The majority unreservedly acknowledges "that Wilson's statements and Lee's statement were substantially alike in all significant aspects." 334 Md. at 338, 639 A.2d at 137. Wilson's strategy was successful in that the jury acquitted him of felony murder.

Wilson did not seek a severance from trial with Lee under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Lee did seek a severance, but only if his motion in limine were denied. Wilson's oral statement referred to Weston's having fired the handgun at some person, other than the victim, earlier during the night of the murder. Lee sought a ruling from the trial court excluding that aspect of Wilson's oral statement, and the motion was granted. Consequently, Lee and Wilson went to trial jointly. Neither defendant sought to have the statement of his codefendant excluded at their joint trial as substantively inadmissible against the defendant. *See Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). Both Lee and Wilson waived their *Bruton* and *Cruz* rights for the obvious reason

that each wanted to rely on his own statement, and on that of his codefendant, without testifying.

Of the three youths involved in the murder, Wilson was the last to be arrested. Prince George's County, Maryland homicide detectives had faxed a copy of the arrest warrant for Wilson to the authorities in Brunswick County, Virginia where Wilson was a student at St. Paul's College. Special Agent Douglas W. Reardon of the Virginia State Police went to the dean of the college who had Wilson "brought" to the dean's office. Wilson arrived with a hamburger sandwich and a large drink which he consumed during the interview by Reardon. In the dean's office Wilson signed a statement that in part read: "The man that got shot said 'I am the bad[d]est guy around' and Anthony [Weston] said 'No I am.' Anthony pulled the gun and the man smacked the gun away and then Anthony shot him."

Special Agent Reardon arrested Wilson and took him to the Brunswick County Sheriff's Office. There, unshackled and seated at one of the desks in the open office area used by the deputies, Wilson gave and signed a second written statement. In that second statement Wilson said that "Anthony pulled the gun and shot the man for no reason."

While Wilson and Reardon were conversing, awaiting the arrival of a Prince George's County detective, Wilson orally told Reardon that Weston and Lee were interested in robbing drug dealers to get the drugs, but Wilson was interested only in getting the money. That portion of the oral statement was admitted.

When Detective Daniel Smart, the principal Prince George's County homicide detective on the subject murder investigation, arrived at the Brunswick County Sheriff's Office, he took the third written statement from Wilson. By that time Prince George's County police officers had obtained a search warrant for the home of Wilson and his parents and seized the handgun used in the murder. That weapon, as described by Lee in his statement, was a ".38 special with D.C. cop written all over it." It was introduced into evidence.

In his written confession to Detective Smart, Wilson said that Weston shot the victim because "[t]hey got into an argument. It was a macho thing. He [the victim] reached out and hit the gun while Anthony had it on him."

Lee's statement described the victim as saying, " 'I'm the biggest hustler around here.' " It continued, "And Anthony said, 'No, you're not. I am.' The whole time the gun was at his head. At first the guy hit the gun away and then Anthony shot the guy. . . ."

Even if a defendant's own, fully-interlocking statement is the type of corroborating evidence that may not be considered under *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), *Wright* recognizes that "the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless." *Id.* at 823, 110 S.Ct. at 3150. Here the majority gives no explanation, in terms of the facts of this case, for rejecting harmless error. This is not a case in which a codefendant attempted to shift blame to the defendant or to minimize the codefendant's involvement by increasing the defendant's involvement. The majority's harmless error analysis gives no effect to the fact that Wilson embraced Lee's statement. Thus, we have here erroneously admitted evidence that is not merely cumulative, but it was relied on by Wilson as part of Wilson's defense.

This is forcefully demonstrated by the final argument of Wilson's counsel. After submitting to the jury that Lee had said that Weston "had an argument with this individual and shot him," Wilson's counsel further said:

"Now, we wouldn't have to be here today if both of them [Lee and Wilson] would have said that we intended to rob this victim, but before Mr. Weston could rob him he shot him, because it would have been a closed case. So now we have to determine whether or not the veracity of these statements can be relied upon. You have heard the instructions that you can believe what you want to of these statements and what you don't want to of these statements. I submit to you that both of these individuals were telling

the truth completely. They had no communication with each other. ... Mr. Lee was arrested at 8:00 o'clock in the morning in Prince George's County and Mr. Wilson was arrested at 5:00 o'clock in the evening at a remote location in Virginia.... If you're going to believe that they contrived the actual incident then you're going to have to believe that these statements are untrue. But, all the evidence points to the fact that they told the truth, that what happened that night[—]Mr. Weston got into an altercation with an individual."

Justice White, speaking for four dissenting Justices in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), has said that "[a] defendant's confession is 'probably the most probative and damaging evidence that can be admitted against him.'" *Id.* at 292, 111 S.Ct. at 1255 (quoting *Cruz v. New York*, 481 U.S. at 195, 107 S.Ct. at 1720 (White, J., dissenting)). Nevertheless, *Arizona v. Fulminante* held that the admission of an involuntary confession is not *per se* beyond the pale of a harmless error analysis under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Chapman* is the basis for *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976). Wilson's four confessions, reinforced by the seizure of the murder weapon, are simply corroborated and confirmed by Lee's cumulative statement. The error is harmless beyond a reasonable doubt. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (erroneously admitting codefendants' cumulative statements held to be harmless); *Evans v. State*, 333 Md. 660, 716, 637 A.2d 117, 145 (1994) (claimed violation in capital case of right against self-incrimination held to be harmless error) [No. 149, Sept. Term, 1992, decided February 16, 1994, slip op. at 23].

## II

Even if the admission of Lee's statement is not harmless beyond a reasonable doubt, the Court, for two reasons, should not preclude the State from undertaking to prove on retrial the circumstances surrounding Lee's statement. First, because there was not a whisper in the trial court that *Wright*

blocked the admissibility of Lee's statement, the State never had the opportunity to prove circumstances of reliability. The State's foundation for admitting the Lee statement established, and was limited to, *Miranda* compliance and voluntariness. Secondly, there is substantial reason to believe that proof addressed to the circumstances surrounding Lee's statement would demonstrate its reliability.

When the State introduced Lee's statement, *Lee*'s attorney objected. The objection went to one sentence in the narrative portion of the statement written in Lee's own hand. After saying that Weston, Wilson and he had gone out in Lee's father's gold Honda and that Wilson had Wilson's father's District of Columbia police officer's revolver, Lee said, "We were going to rob a dope dealer." Lee's counsel argued that the quoted sentence was proof of other crimes which should be excised. That objection was overruled. Lee's counsel then requested a special instruction cautioning the jurors not to speculate that the victim of the shooting was a dope dealer whom the three youths intended to rob. That request was denied. All of this was entirely consistent with the joint defense strategy of seeking to avoid a conviction for felony murder.

Near the conclusion of the foregoing bench conference, Wilson's counsel said, "I would like to go on the record also objecting to the statement being admitted into evidence." The court asked, "You're objecting to what?" Wilson's counsel replied, "The statement, because it hurts my client also." The fact that evidence offered against an accused tends to prove guilt of the crime charged has not been recognized as an objection that renders the evidence inadmissible. Further, judicial review of an objection ordinarily is limited to the reason given for the objection. *See Thomas v. State,* 301 Md. 294, 328, 483 A.2d 6, 23 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *Calhoun v. State,* 297 Md. 563, 601, 468 A.2d 45, 62 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1985); *Jackson v. State,* 288 Md. 191, 196, 416 A.2d 278, 282 (1980); *von Lusch v. State,* 279 Md. 255, 263, 368 A.2d 468, 472 (1977).

When Wilson briefed his belated appeal to the Court of Special Appeals, following a post conviction ruling permitting the same, Wilson did not cite *Wright,* and the State did not contend that Wilson's reliance on *Lee v. Illinois* raised an issue that had not been preserved. The Court of Special Appeals considered the confrontation issue by applying *Lee* and without citing *Wright. Wilson v. State,* 95 Md.App. 680, 622 A.2d 810 (1993). Wilson's petition for certiorari to this Court did not cite *Wright.* The decision was first cited by Wilson in his brief on the merits in this Court. In short, the State has never had an opportunity to present the facts surrounding Lee's statement in support of its reliability under *Wright.*

This Court's foreclosure of that inquiry on remand is particularly inappropriate because there is a strong indication that reliability under *Wright* could be proved. Proof relevant to reliability is not limited to evidence that is admissible before the jury. Whether a foundation for admitting the statement has been established is a mixed question of fact and law for the trial judge to decide, subject to independent, appellate, constitutional review.

One of the indicia of reliability which the *Wright* Court identified as properly considered in determining reliability is the absence of a motive to fabricate. 497 U.S. at 821–22, 110 S.Ct. at 3150. If Lee were motivated to lie, it would only be because he and Wilson in some way had colluded to cast the principal blame on Weston. But the majority tells us nothing about Weston's position.

Weston had been tried previously before a jury presided over by the same trial judge who in April 1991 presided over the joint jury trial of Lee and Wilson. Weston was found guilty of felony murder. The unreported opinion of the Court of Special Appeals in Weston's appeal from that conviction reflects that Weston

"confessed to the police and to a witness, Daryl Shropshire, that he and two friends had gone to the scene of the crime in order to rob drug dealers. [Weston] admitted that he

shot the victim with a .38 caliber weapon when the victim had 'bucked on him.' "

It further appears from the Statement of Charges filed against Wilson, from the affidavit in the search warrant for the Wilson family premises, and from the pre-sentence investigation report that the police were led initially to Weston and Lee, and then to Wilson. More specifically, the above-mentioned sources indicate the following sequence of events.

The victim's body was found at 6:30 a.m. on January 6, 1990. Shortly thereafter Weston admitted to an informant that he had shot the victim. On January 9 the informant telephoned the "Crime Solvers" telephone number of the Prince George's County police and implicated Weston as the shooter. That informant identified himself or herself. Subsequently, when interviewed, the informant confirmed Weston's admission against penal interest and identified Weston from a photo array. By January 10 Weston and Lee had been identified as two of the three suspects in the case. Warrants were issued for the arrest of Weston and Lee on January 10. Both were arrested on January 11, and both admitted involvement in the murder. Both identified Wilson as the third participant.

Lee was arrested at 8:07 a.m. on January 11. After signing a written waiver of rights, Lee began giving his written statement at 8:55 a.m. and concluded it by 10:00 a.m. In that statement Lee also admitted having told his girlfriend, prior to his arrest, about the shooting.

The statement of charges for Wilson was obtained at 10:30 a.m. on January 11. Special Agent Reardon began his interview of Wilson in the dean's office at St. Paul's College in Virginia at 5:30 p.m. that same day. At 7:08 p.m. on January 11, the search warrant for the Wilson family home was executed in Capitol Heights, Maryland, and the Washington Metropolitan Police Department service revolver used in the killing was seized. At 8:00 p.m. Detective Smart of Prince George's County obtained in Virginia the fourth confession from Wilson.

Thus, the jury argument that Wilson's counsel made about the reliability of the Lee and Wilson statements has considerable legal merit. Any motive that Lee would have to lie about the extent of Wilson's participation, said by Lee to be equal with his own, would not likely falsely inculpate Wilson at the expense of falsely inculpating Lee as well. Further, because the Lee statement is in tandem with the four Wilson statements, any unreliability of the Wilson and Lee statements must lie in their falsifying Weston's participation, but it appears from Weston's statement that they do not falsify his participation.

What we do not know from court records on this joint indictment is whether Weston was arrested prior to Lee and whether Weston confessed prior to Lee's confessing. If that is the fact of the matter, as it may well be, it is highly relevant, not because Weston's statement corroborates Lee's, but because Lee then has no motive falsely to inculpate Weston or Wilson.

The State should be permitted the opportunity on remand to demonstrate reliability.

Judges McAuliffe and Karwacki have authorized me to state that they join in the views expressed in this dissenting opinion.